1    **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2    Name   Lay II,      Elwin       K.

           (Last)         (First)         (Initial)

3

   Prisoner Number   D-71078

4

   Institutional Address P.O. Box 689, BW-101L, Soledad, CA 93960-0689

5

6

7                    **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**

8    ELWIN K. LAY II               )

   (Enter the full name of plaintiff in this action.)    )

9                 vs.               )

                              )   Case No.

10    B. Curry, Warden, C.T.F.       )   (To be provided by the clerk of court)

11    A. Schwarzenegger, Governor    )   **PETITION FOR A WRIT**
                              )   **OF HABEAS CORPUS**

12    et al.                       )

13                                          )   **(PR)**

14    (Enter the full name of respondent(s) or jailor in this action) )

15

16                    **Read Comments Carefully Before Filling In**

17    **When and Where to File**

18        You should file in the Northern District if you were convicted and sentenced in one of these

19    counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20    San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21    this district if you are challenging the manner in which your sentence is being executed, such as loss of

22    good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were **not** convicted and sentenced in

24    one of the above-named fifteen counties, your petition will likely be transferred to the United States

25    District Court for the district in which the state court that convicted and sentenced you is located. If

26    you are challenging the execution of your sentence and you are not in prison in one of these counties,

27    your petition will likely be transferred to the district court for the district that includes the institution

28    where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS      - 1 -

<u>Who to Name as Respondent</u>

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack was entered.

A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1. What sentence are you challenging in this petition?

    (a)   Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

Sacramento County Superior Court,  Sacramento, CA
_____
          Court                          Location

    (b)   Case number, if known ___79539_____

    (c)   Date and terms of sentence November, 1987 - 15 years to life

    (d)   Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.)    Yes __X__    No _____

        Where?

        Name of Institution: Correctional Training Facility

        Address: P.O. Box 689, Soledad, CA  93960

2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

P.C. 187 Murder in the second degree
_____
_____
_____

PET. FOR WRIT OF HAB. CORPUS     - 2 -

3. Did you have any of the following?

Arraignment:                    Yes __X__        No _____

Preliminary Hearing:            Yes __X__        No _____

Motion to Suppress:             Yes _____        No __X__

4. How did you plead?

Guilty _____    Not Guilty __X__    Nolo Contendere _____

Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

Jury __X__    Judge alone _____    Judge alone on a transcript _____

6. Did you testify at your trial?            Yes __X__        No _____

7. Did you have an attorney at the following proceedings:

(a)    Arraignment                   Yes __X__        No _____

(b)    Preliminary hearing           Yes __X__        No _____

(c)    Time of plea                  Yes __X__        No _____

(d)    Trial                         Yes __X__        No _____

(e)    Sentencing                    Yes __X__        No _____

(f)    Appeal                        Yes __X__        No _____

(g)    Other post-conviction proceeding    Yes _____    No __X__

8. Did you appeal your conviction?           Yes __X__        No _____

(a)    If you did, to what court(s) did you appeal?

Court of Appeal               Yes __X__        No _____

Year: __unknown__    Result: __Denial_____

Supreme Court of California   Yes __X__        No _____

Year: __unknown__    Result: __Denial_____

Any other court               Yes _____        No _____

Year: _____    Result: _____

(b)    If you appealed, were the grounds the same as those that you are raising in this

petition?                                          Yes _____    No_ X _____

(c)    Was there an opinion?    <u>unknown</u> Yes _____    No_____

(d)    Did you seek permission to file a late appeal under Rule 31(a)?

                                                   Yes _____    No_ X _____

If you did, give the name of the court and the result:

_____

_____

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes _ X _    No_____

[Note: If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition. You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28 U.S.C. §§ 2244(b).]

(a)    If you sought relief in any proceeding other than an appeal, answer the following questions for each proceeding. Attach extra paper if you need more space.

I.    Name of Court: <u>Sacramento County Superior Dourt</u>

Type of Proceeding: <u>Writ of Habeas Corpus</u>

Grounds raised (Be brief but specific):

a. <u>Governor's decision unsupported by any evidence</u>

b._____

c._____

d._____

Result: <u>Denial</u>                    Date of Result: <u>9/20/07</u>

II.    Name of Court: <u>Calif. Appellate Court for the Third District</u>

Type of Proceeding: <u>Writ of Habeas Coupus</u>

Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS          - 4 -

1    a. Governor's decision is unsupported by any evidence

2    b. _____

3    c. _____

4    d. _____

5    Result: Denial _____ Date of Result: 10/17/07

6    III.    Name of Court: _____

7    Type of Proceeding: _____

8    Grounds raised (Be brief but specific):

9    a. Governor's decision is unsupported by any evidence

10    b. _____

11    c. _____

12    d. _____

13    Result: Denial _____ Date of Result: 11/16/08

14    IV.    Name of Court: _____

15    Type of Proceeding: _____

16    Grounds raised (Be brief but specific):

17    a. _____

18    b. _____

19    c. _____

20    d. _____

21    Result: _____ Date of Result: _____

22    (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23    Yes _____    No  X

24    Name and location of court: _____

25    **B. GROUNDS FOR RELIEF**

26    State briefly every reason that you believe you are being confined unlawfully. Give facts to

27    support each claim. For example, what legal right or privilege were you denied? What happened?

28    Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS        - 5 -

1  need more space. Answer the same questions for each claim.

2      [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3  petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5  Claim One: THE GOVERNOR'S REVERSAL OF THE BOARD'S PAROLE GRANT IS

6      UNSUPPORTED BY ANY EVIDENCE AND THEREFORE VIOLATES DUE PROCESS

7  Supporting Facts: See attached, p. 8

8

9

10

11  Claim Two:

12

13  Supporting Facts:

14

15

16

17  Claim Three:

18

19  Supporting Facts:

20

21

22

23      If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25                 N/A

26

27

28

PET. FOR WRIT OF HAB. CORPUS     - 6 -

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2  are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3  of these cases:

4  _____

5  (See attached Memorandum of Points and Authorities, p. 16 et al.

6  _____

7  Do you have an attorney for this petition?                Yes____    No_X___

8  If you do, give the name and address of your attorney:

9  _____

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11  this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13  Executed on _FEB. 11, 2008_                _Elwin K. Lui II_

14          Date                                    Signature of Petitioner

15

16

17

18

19

20  (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

1

## INTRODUCTION

2    Petition, Elwin Lay II, respectfully submits the following

3  Writ of Habeas Corpus in the above entitled case and alleges that

4  his confinement is in violation of both the California and United

5  States Constitutions.  Petitioner seeks relief from the Governor

6  of California's March 22, 2007 reversal of the California Board

7  of Parole Hearings' November 2, 2006 decision granting parole.

8  The sole question in determining parole suitability is whether the

9  inmate currently presents an "unreasonable risk of danger to society

10  if released" on parole. (See Cal. Penal Code § 3041(b); Cal. Code

11  Regs. tit. 15 § 2402(a); In re Wen Lee, (2006) 49 Cal.Rptr.3d 931,

12  937, In re Scott [Scott II] (2005) 34 Cal.Rptr.3d 905; Hayward v.

13  Marshall (9th Cir. 2008) 2008 DJDAR 93, 95) The Governor's decision

14  lacks any evidentiary support that Petitioner currently poses an

15  unreasonable risk to society.

16    Petitioner is a 62 year old hearing impaired, mobility disabled,

17  diabetic, heart bypass patient with twenty (20) years of exemplary

18  imprisonment, positive Psychological Evaluation and realistic parole

19  plans.  The Board properly and correctly held that the gravity of

20  Petitioner's nearly twenty (20) year old offense did not outweigh

21  his years of personal growth, maturity, sincere remorse and

22  deteriorating health in finding Petitioner was clearly not an

23  unreasonable risk to public safety.  However, the Governor's decision

24  reversing the Board relies solely on the predictive value of the

25  immutable factors of his offense and fails to show how these

26  unchangeable facts make Petitioner, in his advanced age and state

27  of disability, a current risk of danger to society.  Such unfounded

28  and unreasonable decision making by the Governor leaves Petitioner,

8

in his waning years, with little hope that there is anything he can do to successfully achieve parole.

## STATEMENT OF FACTS

### I

Petitioner's fifth (5) subsequent parole hearing took place at Correctional Training Facility on November 2, 2006. Petitioner was received into the California Department of Corrections and Rehabilitation on November 24, 1987 from Sacramento County on a single count of second degree murder with a sentence of 15 years to life and a Minimum Eligible Parole Date of March 24, 1997. (Exh. C, p. 1)  In accordance with the Americans with Disabilities Act, the Board identified that Petitioner had his hearing aids, which he needs due to a hearing impairment, that he had a mobility disability requiring use of a cane, and lower back problems which may limit his ability to sit for long periods of time.  The Board also acknowledged that Petitioner was on pain medication at the time of the hearing, which may cause drowsiness, so the Board agreed to keep Petitioner's condition in mind to ensure he was alert and aware throughout the hearing and to ensure he was not suffering undo discomfort. (Exh. A, pp. 3-4)

### II

The Board carefully considered all the relevant, reliable information available to it as required by regulation. (Cal. Code Regs. tit. 15 § 2402(b))  The panel first considered Petitioner's commitment offense.  On March 24, 1987 Petitioner shot and killed Michael Perry at the request of Perry's wife Joan, who promised to pay him from the insurance money.  At the time of the crime

9

1  Petitioner was going through his second divorce and had become

2  suicidally depressed, thinking the whole world was against him.

3  Petitioner accepts responsibility for his crime and is sincerely

4  remorseful. (Exh. C, pp. 13-15)  After discussing Petitioner's pre-

5  commitment factors and family relations the Board turned to

6  Petitioner's parole plans.  Petitioner plans to live with his elderly

7  parents in Modesto and help his brother care for them.  Due to his

8  poor health, Petitioner admits he will be unlikely to work and plans

9  to support himself on his Teamster's pension, Veteran's Benefits,

10  and Social Security payments. (Exh. C, pp. 22-26)  The Board also

11  discussed Petitioner's September 2005 heart attack, bypass surgery,

12  and continuing treatment. (Exh. C, pp. 27-29)  The Board then turned

13  to Petitioner's post-conviction factors.

14      The Board observed that Petitioner had "quit a good disciplinary

15  history" consisting of only one 115 for a physical altercation in

16  May of 1992 and only five counseling chronos, all prior to 2001.

17  (Exh. C, p. 30)  The Board also noted that Petitioner has

18  participated extensively in both Alcoholics Anonymous and Narcotics

19  Anonymous as a good faith effort at personal growth even though

20  Petitioner has no history of substance abuse. (Exh. C, pp. 32-34)

21  Petitioner's Psychological Evaluation was reviewed indicating his

22  violence potential was "no more that the average citizen in the

23  community" and there were "no significant risk factors, which may

24  be precursors to violence for this individual." (Exh. C, p. 35)

25  The Board's review of the relevant, reliable evidence at hand

26  revealed Petitioner to be a sincere, mature, remorseful man who

27  made a terrible error in judgment during a period of stress in his

28  life who, nearly 20 years after the fact, clearly does not represent

10

1  an unreasonable risk to public safety.

2  **III**

3  At the closing of the hearing, the Deputy District Attorney

4  acknowledged Petitioner's positive programming but opposed parole

5  solely on the basis of the commitment offense. (Exh. C, pp. 39-41)

6  However, after the Board recessed for deliberations it returned

7  to address the past testimony of the prosecuting attorney, Steven

8  Secrest.  The Board reviewed Mr. Secrest's testimony from

9  Petitioner's June 5, 2002 hearing where Secrest said that Petitioner

10  "was a suitable candidate for a release date."  The Board panel

11  then read into the record Mr. Secrest's testimony from Petitioner's

12  March 2, 2004 hearing where Secrest stated "I've never asked for

13  an inmate to get a date at a lifer hearing before and I've done

14  a lot of them.  But I would like you to give Mr. Lay a date." (Exh.

15  C, pp. 46-48)  Thus, in the mind of the prosecuting attorney, who

16  clearly has a more detailed understanding of the nature and

17  circumstances of Petitioner's crime than anyone else, Petitioner

18  has been suitable for parole for more that four (4) years prior

19  to the current hearing.

20  **IV**

21  After careful deliberation on all of the evidence, the Board

22  found Petitioner suitable for parole.  The Board stated for the

23  record;

24  "First of all, I did want to note the Panel did consider
    the gravity of the commitment offense.  We've reviewed
25  it and went back and looked at the offense again, so this
    Panel is certainly aware of all the aspects of the
26  commitment offense and the gravity thereof." (Exh. C,
    p. 49)

27

28  The Board then noted Petition's lack of a juvenile record, that

11

he had enhanced his ability to function upon release, his extensive
prison programming and work history and furthermore stated;

> "The Panel noted that because of maturation, growth and
> a greater understanding in your advanced age, that there's
> a reduced probability of recidivism.  The Panel also took
> note of the health issues, that that would be another
> factor in the likelihood of probability of recidivism."
> (Exh. C, p. 50)

The Board went on to note Petitioner's favorable Psychological
Evaluation and the opinions of the prosecuting attorney before
calculating Petitioner's term.  The Panel chose a term of 228 months
and after deducting 72 months post-conviction credits arrived at
a term of 156 months or 13 years. (Exh. C, p. 55)  Therefore, when
Petitioner was found suitable by a Board Panel which carefully
weighed the gravity of his offense against all other factors and
found him not to be an unreasonable risk to society he had already
served seven (7) years beyond his uniform term.

<u>V</u>

The Board's decision became final on March 2, 2007 after the
Board's Decision Review approved it. (Exh. B, p. 1)  The Governor
reversed the decision on March 22, 2007.  In his Statement the
Governor indicated the sole reason was the immutable factors of
the offense.  The Governor found that the "gravity of the murder
perpetrated by Mr. Lay presently outweighs the positive factors",
and "I believe his release would pose an unreasonable risk of danger
to society at this time." (Exh. A, p. 3)  Contrary to California
parole law, the Governor failed to show how the immutable factors
of the offense make Petitioner a <u>current</u> risk to society after nearly
20 years of exemplary imprisonment, his advanced age, and
deteriorating health.  By failing to show a nexus between the

1   unchanging circumstances of Petitioner's offense and his current

2   risk to society the Governor rendered a decision that is unsupported

3   by any evidence.   All of the evidence presented at Petitioner's

4   hearing and carefully considered by the Board supported the original

5   and properly reasoned finding that Petitioner does not pose an

6   unreasonable risk to society and is therefore suitable for parole.

7                               **VI**

8       In a decision dated 9/20/07 The Superior Court of the Count

9   of Sacramento denied Petitioner's Writ of Habeas Corpus finding

10  only that "The circumstances of the murder exceed the minimum

11  elements, as cited in <u>Rosenkrantz</u>, and support the denial of parole."

12  The court, like the Governor, failed to provide any analysis as

13  to how the facts of the offense make Petitioner a current risk to

14  public safety in light of two decades of exemplary imprisonment,

15  advanced age, deterioration health, and support for parole by the

16  prosecuting attorney.

17      This decision is contrary to, and an unreasonable application

18  of, State and Federal law.   This decision is also an unreasonable

19  determination of the facts in light of the evidence as will be shown

20  below. (See Exh. D)

21      Both State and Federal Courts have held that even in cases

22  where offense factors support parole denial under regulatory law,

23  due process may preclude the crime alone justifying parole denial

24  in the face of a prisoner's long term exemplary type prison record

25  demonstrating rehabilitation. (<u>In re Lee</u> (2006) 49 Cal.Rptr.3d 931,

26  939; <u>In re Scott</u> [Scott II] (2005) 34 Cal.Rptr.3d 910, 916-920;

27  <u>Irons v. Carey</u> (9th Cir. 2007) 479 F.3d. 658, 665; <u>Rosenkrantz v.</u>

28  <u>Marshall</u> (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1084)   The proper

                               13

1   test under both regulatory law and case law is to determine whether

2   some reasonable, reliable evidence indicates a parolee's release

3   unreasonably endangers public safety. (Cal. Code Reg. tit. 15 §

4   2402(a); Lee, Supra, at 936; In re Elkins, (2006) 50 Cal.Rptr.3d

5   503, 512; Scott II, supra; Biggs v. Terhune (2005) 334 F.3d 910;

6   Hayward v. Marshall (9th Cir. 2008) 2008 DJDAR 93, 95)

7        The Board of Parole Hearings applied the proper test when it

8   found Petitioner suitable for parole despite the circumstance of

9   the offense, there being no reliable evidence in the record

10  indicating that Petitioner is a current risk to public safety.

11  Neither the Governor's decision revoking parole, not the Superior

12  Court's decision to uphold it, speak to the overriding issue of

13  public safety being the only exception to the rule that parole

14  normally be granted.  Review by the Federal Courts is required to

15  ensure that the proper test is applied and due process is satisfied.

16                                 VII

17       Petitioner has no plain, speedy or adequate remedy in the

18  ordinary course of law.  Thus, the only available avenue for relief

19  is through the court system by way of the instant Petition for Writ

20  of Habeas Corpus.  Petitioner's continued confinement is unlawful

21  in that he is entitled to be paroled but has been wrongfully denied

22  that right.  Said confinement violates the United States

23  Constitution's V and XIV Amendment's due process clause, as well

24  as the comparable provisions of the Californai Constitution.

25

26

27

28

                                14

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests that this court:

1. Issue a Writ of Habeas Corpus or Order to Show Cause to the Warden of Correctional Training Facility and the Governor of California to inquire into the legality of Petitioner's incarceration;

2. Order the immediate release of Petitioner;

3. Conduct an evidentiary hearing if necessary to resolve any disputed factual issues, and after the hearing, issue an order directing the State to act as set forth above;

4. Discharge Petitioner free from both actual and constructive custody, or alternatively, apply any excess time in custody beyond the proper term for his offense against his maximum period of parole.

5. Grant such other and further relief as justice may require, and:

6. Retain jurisdiction to see that relief is actually achieved.


Date: FEB. 11, 2008                    Respectfully submitted,



                                       _Elwin K. Lay II_

                                       Elwin K. Lay II
                                       Petitioner In Pro Per

## MEMORANDUM OF POINTS AND AUTHORITIES

### STANDARD OF REVIEW

The current judicial standard for reviewing a decision of the the Board of Parole Hearings to deny parole, or of the Governor's reversal of a parole grant is to determine if some reliable, relevant evidence was considered showing the prisoner <u>currently</u> poses an unreasonable risk to public safety. (<u>In re Lee</u> (2006) 49 Cal.Rptr.3d 931, 936)  Furthermore, the reasons the Board or the Governor used to deny parole must be viewed in the context of the other factors the Board must consider to see if some evidence shows that the prisoner continues to pose an unreasonable risk to public safety. (<u>Lee</u>, <u>supra</u>, at 937 quoting <u>In re Scott</u> [Scott II] (2005) 34 Cal.Rptr.3d 905; see also <u>In re Capistran</u> (2003) 107 Cal.App.4th 1299, 1306.)  Finally a determination should be made whether continuing to deny parole based on the immutable factors of the offense violates due process. (<u>Scott II</u>, <u>supra</u>; <u>Biggs v. Terhune</u> (9th Cir. 2003) 334 F.3d 910, 916-917; <u>Irons v. Carey</u> (9th Cir. 2007) 486 F.3d 658)  However, should the Board or the Governor misinterpret statutory law and in the process violate a prisoner's due process, the non-deferential review standard applies. (<u>Girardo v. Antonidi</u> (1994) 8 Cal.4th 791, 800 [questions at law are reviewed de novo]; <u>Brown v. Pool</u> (9th Cir. 2003) 337 F.3d 1155)

    I   PETITIONER'S RIGHT TO DUE PROCESS WAS VIOLATED WHEN THE GOVERNOR REVERSED THE BOARD'S GRANT OF PAROLE BY RELYING EXCLUSIVELY ON THE PREDICTIVE VALUE OF THE 20 YEAR OLD COMMITMENT OFFENSE AND RENDERED A DECISION UNSUPPORTED BY ANY EVIDENCE.

Both State and Federal Courts have held that even in cases where offense circumstances support parole denial under regulatory law, due process may preclude the crime alone justifying parole

denial in the face of a prisoner's long term exemplary type record
demonstrating rehabilitation. (See e.g. In re Lee (2006) 49
Cal.Rptr.3d 931, 939; In re Scott [Scott II] (2005) 34 Cal.Rptr.3d
910, 916-920; Irons v. Carey (9th Cir. 2007) 479 F.3d 658, 665;
Hayward v. Marshall 2008 DJDAR 93, 95; Rosenkrantz v. Marshall (C.D.
Cal. 2006) 444 F.Supp.2d 1063, 1084)  This Petitioner's parole grant
was reversed by the Governor based solely on the unchanging
circumstances of his offense after nearly 20 years of exemplary
imprisonment and without any analysis showing just how the immutable
crime factors make Petitioner an unreasonable risk to society at
the present time.

A. Unchanging Offense Factors Lose their Predictive Value with the
   Passage of Time.

   Article V, Section 8(b) of the Constitution of the State of
California requires that a parole decision reviewed by the Governor
must be decided on the same factors the Board is required to
consider.  The California Supreme Court has held that a parole denial
need only be supported by "some evidence". (In re Rosenkrantz, (Cal.
2002) 128 Cal.Rptr.2d 104, 156)  However, the "test is not whether
some evidence supports the reasons the Governor cites for denying
parole, but whether some evidence indicates a parolee's release
unreasonable endangers public safety. (Lee, 49 Cal.Rptr.3d 931,
936, Cal. Code Regs. tit. 15 § 2402(a))  Furthermore, "[s]imply
from the passage of time, [a prisoner's] crimes almost 20 years
ago have lost much of their usefulness in foreseeing the likelihood
of future offenses". (Lee, supra, at 939; see also Scott II 34
Cal.Rptr.3d 910, 927)  The Federal Courts have come to the same
conclusion on this matter, holding that "indefinite detention based

17

1    solely on an inmate's commitment offense, regardless of the extent
2    of his rehabilitation, will at some point violate due process, given
3    the liberty interest in parole that flows from the relevant
4    California statutes", and that this violation occurs once a prisoner
5    has served beyond his "minimum term". (Irons, 479 F.3d 658, 665;
6    Hayward, supra)  Petitioner has served nearly 20 years for his crime
7    placing him well beyond the minimum term of his 15 to life sentence
8    and at the point where the predictive value of his crime is nil.

9         Lee is particularly instructive because it closely parallels
10   Petitioner's predicament.  Lee committed his crime as a result of
11   a financial dispute over the sale of a restaurant.  Lee drove to
12   the restaurant with a gun, confronted his intended victim and fired
13   indiscriminately, wounding his intended victim and killing an
14   innocent bystander resulting in a 17 to life sentence for second
15   degree murder and an additional life term for attempted murder.
16   (Lee, supra, at 933)  During Lee's incarceration he, like Petitioner,
17   exhibited model behavior as his health deteriorated leaving him,
18   like Petitioner, permanently disabled. (Id. at 934)  After serving
19   16 years, 4 years less than Petitioner, on his single 15 to life
20   sentence, the Board found Lee suitable for parole, but like
21   Petitioner, the Governor reversed, finding the crime to be "more
22   than the minimum necessary to sustain his convictions without
23   indicating exactly how Lee currently posed an unreasonable risk
24   to society. (Id. at 934)  The court vacated the Governor's decision
25   and reinstated Lee's parole date finding that the Governor's decision
26   lacked "any evidentiary support". (Id. at 941)  The Governor's
27   decision in Petitioner's case is equally without merit and requires
28   the same relief.

B. **Petitioner's Crime Factors are Not Sufficiently Egregious to Support Parole Denial After Nearly 20 Years of Exemplary Behavior.**

Of particular note are the near simultaneous rulings by both the State and Federal Courts in the latest and last chapter of the Rosenkrantz saga. In In re Rosenkrantz, (29 Cal.4th 616, 658) in 2002 the California Supreme Court established that doctrine that a parole denial must be supported by at least "some evidence". The crime itself may constitute some evidence if it is found to be "particularly egregious" compared to other similar offenses as long as this exception does not "swallow the rule that parole normally be granted." (Rosenkrantz, supra, at 683 quoting In re Ramirez, (2001) 114 Cal.Rptr.2d 381) In Rosenkrantz's case, the fact that he had, over a period of days, bought a gun, practiced with it, waited outside the victims apartment before confronting him, shooting him ten times and killing him, was found to be "some evidence" that the crime alone was grounds for denying parole. However, even though this crime was clearly "particularly egregious" and contained elements of first degree murder both State and Federal Courts have found its predictive value to have diminished with time in the face of Rosenkrantz's exemplary conduct.

In an order dated 6/26/06 the Superior Court at Los Angeles County found that "[Rosenkrantz] has reached the point in which the denial of parole can no longer be justified by reliance on his commitment offense", and granted relief releasing Rosenkrantz. (Case No: RH003529) In a similar ruling the Federal Court for the Central District of California further reinforced this reasoning. They found that the Board's 2004 decision denying parole based solely on offense factors violated due process for two reasons:

19

First, continued reliance upon the unchanging facts of Petitioner's crime makes a sham of California's parole system and amounts to an arbitrary denial of Petitioner's liberty interest.

Second...the circumstances of Petitioner's crime do not amount to some evidence supporting the conclusion that Petitioner poses an unreasonable risk of danger if released.

...After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil. (Rosenkrantz v. Marshall 444 F.Supp.2d 1063, 1084 (C.D. Cal. 2006))

Therefore Petitioner's offense, which like Rosenkrantz's was found to contain elements of first degree murder, no longer amounts to "some evidence" in light of his nearly twenty years of rehabilitation.

C. The Governor's Decision Violates Petitioner's Right to Due Process.

Evidence relied upon by the Governor to support a reversal of a parole grant must contain "some indicia of reliability" understood as "some rational basis in fact". (In re Elkins, (2006) 50 Cal.Rptr.3d 503, 512; Scott II, 34 Cal.Rptr.3d 905; Biggs v. Terhune, (2003) 334 F.3d 910)  In Petitioner's case the Governor, unlike the Board, premised his decision solely on Petitioner's commitment offense. (Exh. A, pp. 2-3)  The Governor discussed Petitioner's offense factors in narrative form without any analysis as to how these factors make Petitioner a current risk to public safety in light of his 20 years of model behavior, advanced age and deteriorating health.  Consequently, this decision lacks the "rational basis in fact" required by due process.  Furthermore, the Governor notes the District Attorney's Office's opposition to parole without mentioning the prosecuting attorney's statements,

1 | read into the record by the Board, calling for Petitioner's parole
2 | despite this attorney's intimate knowledge of the nature and
3 | circumstances of Petitioner's offense.  Such action deprives
4 | Petitioner of the "individual consideration" required by due process
5 | and renders the Governor's decision arbitrary and capricious. (Scott
6 | II, supra, at 917)  Petitioner's situation is precisely what the
7 | court warned about in In re Ramirez (2001) 114 Cal.Rptr.2d 381,
8 | 392) when it ruled that "were the [Governor] to determine whether
9 | inmates are suitable for parole by flipping a coin, [he] could not
10 | insulate [his] proceedings from judicial correction simply by
11 | identifying "some evidence" in the record to support each result."
12 | Accordingly the Governor's decision reversing the Board's grant
13 | of parole should be vacated and Petitioner's term as set by the
14 | Board reinstated.

15 | ## Conclusion

16 | The Governor of California, by his March 22, 2007 decision
17 | reversing the Board of Parole Hearing's November 2, 2006 parole
18 | grant, violated Petitioner's right to due process as guaranteed
19 | by his liberty interest in parole.  It is clear that after 20 years,
20 | given Petitioner's positive prison program, advanced age and state
21 | of disability, the immutable factors of his offense no longer provide
22 | predictive value demonstrating he currently would pose an
23 | unreasonable threat to society if releases on supervised parole.
24 | Therefore Petitioner respectfully submits this court should issue
25 | a Writ of Habeas Corpus or Order to Show Cause, directed to the
26 | State Executive to inquire into Petitioner's continued imprisonment,
27 | and after briefing, issue an order to release Petitioner and direct
28 | such other relief as is appropriate under the circumstances.

# EXHIBIT A



# OFFICE OF THE GOVERNOR

March 30, 2007

*__Via Facsimile and U.S. Mail__*

Mr. Elwin Lay, D-71078
*__Correctional Training Facility__*
CFBW T1 101L
Post Office Box 686
Soledad, California 93960

Dear Mr. Lay:

Penal Code section 3041.2 authorizes the Governor to review parole decisions of the Board of Parole Hearings (Board) concerning persons sentenced to an indeterminate term upon conviction of murder.

After considering the same factors considered by the Board, the Governor has invoked his authority to <u>reverse</u> the Board's decision to grant parole in your case. The Governor's statement of the reasons for his decision is attached.

A copy of this letter is being provided to you via facsimile, and the signed original (along with a statement of the reasons for his decision) is being sent by mail. Additionally, we are transmitting a copy of this letter and the attached decision to the Chairperson of the Board of Parole Hearings.

Sincerely,

LOUIS MAURO
Chief Deputy Legal Affairs Secretary

Attachment

cc: Board of Parole Hearings (w/attachment)

GOVERNOR ARNOLD SCHWARZENEGGER • SACRAMENTO, CALIFORNIA 95814 • (916) 445-2841

A - 1

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
(Penal Code Section 3041.2)

**ELWIN LAY D-71078**
**SECOND-DEGREE MURDER**

**AFFIRM:**       _____

**MODIFY:**      _____

**REVERSE:**      _____**X**_____

On March 25, 1987, Elwin Lay shot and killed Michael Perry.

Michael and Joan Perry were walking from a convenience market when Mr. Lay grabbed Mr. Perry, put a pistol to his head, and shot him. A witness saw Mr. Lay flee the scene in his pick-up truck. Mr. Perry died. According to Mr. Lay, Mrs. Perry asked him to kill her husband for a sum of money.

Mr. Lay was arrested the same day. A jury convicted him of second-degree murder, and he was sentenced to 15 years to life in prison.

When he committed this crime, Mr. Lay was 42 years old. Although he had no prior juvenile record, as an adult he was convicted of welfare fraud and sexual battery. During his incarceration for the life offense, Mr. Lay was disciplined in 1992 for engaging in a physical altercation. He was also counseled five times for minor misconduct, most recently in 2001.

I considered various positive factors in reviewing whether Mr. Lay is suitable for parole at this time. Mr. Lay entered prison with a high school diploma and some college education. His institutional job skills include culinary, yard crew, porter, laundry, and clerical assignments. He participated in an array of self-help and therapy, including Alcoholics Anonymous, Narcotics Anonymous, 12-Steps, Family Harmony, and Breaking Barriers. He also completed a book report entitled, "I'm O.K., Your O.K." He maintains seemingly solid relationships and close ties with supportive family members, and he received favorable evaluations from various correctional and mental-health professionals over the years. The 2006 Board ordered that Mr. Lay parole to Stanislaus County, even though his last legal residence was in Sacramento County. He plans to live with his parents in Stanislaus County where he plans to collect his retirement benefits earned from prior work experience.

Despite the positive factors I considered, the second-degree murder for which Mr. Lay was convicted was especially atrocious because it was carried out in a dispassionate and calculated manner, and there is evidence that the murder was committed for financial gain, making Mr. Lay's actions more than the minimum elements necessary to sustain a conviction for second-degree murder. According to a letter from the Deputy District Attorney to the Board dated September 1, 1993, Mr. Lay and Mrs. Perry had an affair prior to the murder and planned to kill

A - 2

Elwin Lay, D-71078
Second-Degree Murder
Page 2

Mr. Perry for his life insurance proceeds. In exchange for killing Mr. Perry, Mrs. Perry agreed to give Mr. Lay $5,000 of the life insurance money. In a written statement to his 2002 Life Prisoner evaluator, Mr. Lay admitted that he and Mrs. Perry planned to kill Mr. Perry in exchange for money. Furthermore, the probation report indicates that Mr. Lay was instructed to sit in his truck until he was given a signal by Mrs. Perry to shoot Mr. Perry. Mr. Lay admitted in his 2003 mental-health evaluation that he waited for Mr. Perry and then shot Mr. Perry in the head. The gravity of the second-degree murder committed by Mr. Lay is alone sufficient for me to conclude presently that his release from prison would pose an unreasonable public-safety risk.

I note that the Sacramento County District Attorney's Office registered opposition to parole, based in part on the gravity of the offense.

At age 62 now, after being incarcerated for more than 19 years, Mr. Lay made some creditable gains in prison, including accepting responsibility for his actions and expressing remorse. But given the current record before me, and after carefully considering the very same factors the Board must consider, I find that the gravity of the murder perpetrated by Mr. Lay presently outweighs the positive factors. Accordingly, because I believe his release would pose an unreasonable risk of danger to society at this time, I REVERSE the Board's 2006 decision to grant parole to Mr. Lay.

Decision Date: _3/22/2007_

_ARNOLD SCHWARZENEGGER_
ARNOLD SCHWARZENEGGER
Governor, State of California

# EXHIBIT B

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**BOARD OF PAROLE HEARINGS**
DECISION PROCESSING AND SCHEDULING UNIT
P.O. Box 4036
Sacramento, CA 95812-4036



March 20, 2007


Elwin Lay D-71078
Correctional Training Facility
31625 Highway 101N
Soledad, CA 93960

Dear Mr. Lay:

Your parole consideration hearing was conducted on November 2, 2006. Decision Review is completed and the final decision date of your hearing is March 2, 2007.   The decision has been approved by the California Department of Corrections and Rehabilitation, Board of Parole Hearings.

The decision finding you suitable for parole may be subject to review by the Governor.

Attached is the last "Decision Page" with the stamped final date and a front cover sheet to your transcript.   Please incorporate these pages in your copy of the hearing transcript.


Sincerely,

SANDRA D. MACIEL
Chief, Decision Processing
   and Scheduling Unit

Enclosure

cc:      Institution Records Office


lc

STATE OF CALIFORNIA — DEPARTMENT OF CORRECTIONS AND REHABILITATION                    ARNOLD SCHWARZENEGGER, GOVERNOR

**BOARD OF PAROLE HEARINGS**
**DECISION PROCESSING AND SCHEDULING UNIT**
P.O. Box 4036
Sacramento, CA 95812-4036



December 4, 2006

Elwin Lay D-71078
Correctional Training Facility
31625 Highway 101N
Soledad, CA 93960

Dear Mr. Lay:

Your parole consideration hearing was conducted on November 2, 2006.
This is your copy of the transcript of that hearing.  The decision of the
hearing is currently in decision review, which means the decision is still
pending and has not become final.  Upon completion of decision review,
you will be notified by letter as to the final decision date of the hearing.

If you have any questions concerning the mailing of your transcript before
decision review has been completed, you may contact the Lifer
Scheduling Unit at the following address:

   CDCR - Board of Parole Hearings
   Post Office Box 4036
   Sacramento, CA  95812-4036

Sincerely,

SANDRA D. MACIEL
Chief, Decision Processing
   and Scheduling Unit

Enclosure

cc: Institution Records Office

ch

# EXHIBIT C

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

INMATE COPY

In the matter of the Life        )
Term Parole Consideration        )        CDC Number D-71078
Hearing of:                      )
                                 )
ELWIN LAY                        )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

NOVEMBER 2, 2006

2:52 p.m.


PANEL PRESENT:

Jack Garner, Presiding Commissioner
Janice Eng, Commissioner
Jeff Sellwood, Deputy Commissioner


OTHERS PRESENT:

Elwin Lay, Inmate
Mary Ann Tardiff, Attorney for Inmate
Frank Meyer, Deputy District Attorney
Correctional Officer Unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No          See Review of Hearing
_____  Yes         Transcript Memorandum


**Sue Gerdes    Northern California Court Reporters**

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

**INMATE COPY**

In the matter of the Life    )
Term Parole Consideration    )        CDC Number D-71078
Hearing of:                  )
                             )
ELWIN LAY                    )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

NOVEMBER 2, 2006

2:52 p.m.

PANEL PRESENT:

Jack Garner, Presiding Commissioner
Janice Eng, Commissioner
Jeff Sellwood, Deputy Commissioner

**PENDING REVIEW AND APPROVAL**

OTHERS PRESENT:

Elwin Lay, Inmate
Mary Ann Tardiff, Attorney for Inmate
Frank Meyer, Deputy District Attorney
Correctional Officer Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No            See Review of Hearing
_____ Yes           Transcript Memorandum

**Sue Gerdes    Northern California Court Reporters**

<u>INDEX</u>

<u>Page</u>

Proceedings ............................................... 1

Case Factors ............................................. 9

Pre-Commitment Factors ................................. 15

Parole Plans ........................................... 23

Post-Commitment Factors ................................ 29

Closing Statements ..................................... 39

Recess ................................................. 48

Decision ............................................... 49

Adjournment ............................................ 57

Transcriber Certification .............................. 58

--oOo--

1

### P R O C E E D I N G S

2      **DEPUTY COMMISSIONER SELLWOOD:**  On the record.

3      **PRESIDING COMMISSIONER GARNER:**  All right.  Very

4   good.  This is a parole consideration, a subsequent

5   parole consideration for Elwin, E-L-W-I-N, Lay, L-A-Y,

6   CDC number D, like David, 71078.  The date today is

7   November 2nd, 2006.  It is now 2:52 p.m. and we're

8   located at the Correctional Training Facility in

9   Soledad.  Mr. Lay was received into CDC on

10  November 24, 1987 from Sacramento County.  The offense

11  is murder in the second degree and the case number is

12  79539.  Count number one is PC 187 and the term is 15

13  years to life and the minimum eligible parole date is

14  March 24, 1997.  This hearing is going to be tape-

15  recorded and for purposes of voice identification, each

16  of us at the table is going to be required to give our

17  first name, last name, spelling the last name.  When it

18  comes to your turn Mr. Lay, if you'd also give us your

19  CDC number.  I'll start and go to my left.  I'm Jack

20  Garner, G-A-R-N-E-R, Commissioner.

21      **COMMISSIONER ENG:**  Janice Eng, E-N-G,

22  Commissioner.

23      **DEPUTY COMMISSIONER SELLWOOD:**  Jeff Sellwood, S-

24  E-L-L-W-O-O-D, Deputy Commissioner.

25      **DEPUTY DISTRICT ATTORNEY MEYER:**  Frank Meyer, M-

26  E-Y-E-R, Sacramento County District Attorney's Office.

27      **ATTORNEY TARDIFF:**  Mary Ann Tardiff, T-A-R-D-I-

2

1    F-F, Attorney for Mr. Lay.

2          **INMATE LAY:**  Elwin Lay, E-L-W-I-N, L-A-Y, Delta

3    71078.

4          **PRESIDING COMMISSIONER GARNER:**  Okay.  Very

5    good, thank you.  We also have two correctional peace

6    officers with us this afternoon for purposes of

7    security.  Mr. Lay, only because we did chat with you

8    on Tuesday about the options that were available to you

9    and some of your circumstances involved in Ms. Tardiff

10   not having files, which at that time we indicated you

11   weren't the only one that happened to.  She didn't get

12   the files from the institution and that day you

13   indicated that you did want to have Ms. Tardiff

14   represent you.  I'll ask you again to reaffirm that

15   today because we're now in possession of a letter

16   that's dated October 18th, 2006 in which you express the

17   fact that you did not want Ms. Tardiff to represent

18   you.  So, what I need to do is have you put on the

19   record today that, with respect with to this letter

20   that you're withdrawing that letter and you are asking

21   Ms. Tardiff to be re-entering the record for you today.

22         **INMATE LAY:**  That is correct.

23         **PRESIDING COMMISSIONER GARNER:**  Very good.

24   Okay.  Well, let's get started.  First of all, let's

25   talk about ADA.  We do have the form that you signed

26   Mr. Lay on June 15th, 2006.  And again, this is the form

27   that provides reasonable accommodations associated with

3

1     Americans With Disabilities Act.  You indicate that you

2     need hearing aids, which you have today.  There's also

3     an indication from the correctional counselor that you

4     do have mobility disability and that you do you lower

5     spine problems.

6              INMATE LAY:  Yes, sir.

7              PRESIDING COMMISSIONER GARNER:  And let me --

8     this is noted in a CDC 128AC, 5/19 of '06.  And could

9     you let us know what limitations you have as a result

10    of the lower spine problems.

11             INMATE LAY:  Well, I have limited mobility.

12    Just you know, standing up, sitting down to long and

13    kind of loose something.  Just a normal thing with back

14    problems.  I've got deteriorating bones in my body,

15    old.

16             PRESIDING COMMISSIONER GARNER:  Are you on any

17    medications for this particular pain?

18             INMATE LAY:  Yes, I am.

19             PRESIDING COMMISSIONER GARNER:  And are you

20    current on those medications?

21             INMATE LAY:  Yes, I am.

22             PRESIDING COMMISSIONER GARNER:  And are there

23    any side affects that we need to know about that might

24    have an impact on the hearing?

25             INMATE LAY:  They do cause drowsiness.

26             PRESIDING COMMISSIONER GARNER:  If we see you

27    nodding off, make sure you come on back.  Okay.

4

1          INMATE LAY:  Yes.

2          PRESIDING COMMISSIONER GARNER:  The other thing

3    that I offer to you is -- I do know the lower back

4    problems all come and not have issue with associated

5    with prolonged sitting.  If at some point during this

6    hearing you find yourself in a state of discomfort, let

7    us know and we'll take a brief recess to let you walk

8    that around a little bit, so that you don't continue

9    the discomfort.  Okay.

10          INMATE LAY:  Okay.  Thank you.

11          PRESIDING COMMISSIONER GARNER:  We're going to

12   have to rely on you to tell us that.

13          INMATE LAY:  All right, sir.

14          PRESIDING COMMISSIONER GARNER:  Unless you fall

15   out of the chair in pain that might be what we call a

16   clue.  Otherwise, it's going to be up to you.

17          INMATE LAY:  Okay.

18          PRESIDING COMMISSIONER GARNER:  Okay.  And I do

19   note for the record that there's a grade point level of

20   12.9.  And I'll just again, ask real quickly, since

21   June 15th of 2006, has there been any other changes in

22   your health?  we've talked about your mobility, we've

23   talked about your hearing.  How about your vision?

24          INMATE LAY:  My vision is corrected with

25   glasses.

26          PRESIDING COMMISSIONER GARNER:  Did you do an

27   Olsen Review?

5

1          INMATE LAY:  Yes, I did.

2          PRESIDING COMMISSIONER GARNER:  And did you have

3     your glasses with you?

4          INMATE LAY:  Yes.

5          PRESIDING COMMISSIONER GARNER:  And they work

6     okay?

7          INMATE LAY:  Yes.

8          PRESIDING COMMISSIONER GARNER:  All right.

9     Ms. Tardiff, with all the things we've talked about

10    have we sufficiently addressed the ADA interests?

11         ATTORNEY TARDIFF:  Yes.

12         PRESIDING COMMISSIONER GARNER:  All right.

13    Thank you.  This hearing is being conducted in pursuant

14    to Penal Code Sections 3041 and 3042 and the Rules and

15    Regulations of Board of Parole Hearings governing

16    parole consideration hearings for life inmates.  The

17    purpose of today's hearing is to consider your

18    suitability for parole.  In doing so, we will consider

19    the number and nature of the crimes you were committed

20    for, your prior and criminal and social history, your

21    behavior and programming since your commitment.  We've

22    had the opportunity to review your Central File and

23    your prior hearing transcripts.  You will be given the

24    opportunity to correct or clarify the record.  We will

25    consider your progress since your commitment and since

26    your last hearing.  Your updated counselor's report and

27    psychological report will also be considered.  And any

6

1    change in parole plans should be brought to our

2    attention.  We'll reach a decision today and inform you

3    whether or not we find you suitable for parole and the

4    reasons for our decision.  If you are found suitable

5    for parole, the length of your confinement will be

6    explained to you.  This hearing will be conducted in

7    multiple phases.  I'll discuss with you the crime you

8    were committed for, your prior criminal and social

9    history.  Commissioner Eng will discuss with you your

10   parole plans and any letters of support or opposition

11   that may be in the file.  Commissioner Sellwood will

12   discuss with you your progress since your commitment,

13   your counselor's report and your psychological

14   evaluation.  Once that is concluded, the

15   commissioner's, the district attorney and your attorney

16   will be given the opportunity to ask you questions.

17   Questions for the district attorney will be asked

18   through the chair and you should direct your answers

19   back to the Panel.  Before we recess for deliberations,

20   the district attorney, your attorney and you will be

21   given an opportunity to make a final statement

22   regarding your parole suitability.  Your statement

23   should be directed as to why you feel you are suitable

24   for parole.  We will then recess, clear the room and

25   deliberate.  Once we've completed our deliberations we

26   will resume the hearing and announce our decision.  The

27   California Code of Regulations states regardless of

7

1   time served a life inmate shall be found unsuitable for

2   and denied parole if in the judgment of the Panel the

3   inmate would pose an unreasonable risk of danger to

4   society if released from prison.  Now Mr. Lay, has

5   certain rights coming in to today's hearing.  The first

6   was the timely notice of the hearing, second being the

7   right to review your Central File and the third being

8   present relevant documents.  I'd like to ask you and

9   Ms. Tardiff if those rights have been met.

10          **ATTORNEY TARDIFF:**  They have.

11          **INMATE LAY:**  Yes, sir, they have.

12          **PRESIDING COMMISSIONER GARNER:**  You also have a

13   right to be heard by an impartial panel.  Today your

14   panel will consist of myself, Commissioner Eng and

15   Commissioner Sellwood.  Do you have any objection to

16   the panel?

17          **INMATE LAY:**  No.

18          **PRESIDING COMMISSIONER GARNER:**  Okay.  You will

19   receive a copy of our written tentative decision today.

20   And a copy of the decision and a copy of the transcript

21   will be sent to you in the future.  You are probably

22   aware, May 2004, major changes to the appeal procedure

23   to appeal Panel decisions now requires you to go

24   through the courts, it's called Appeals and Grievances.

25   Are you aware of that?

26          **INMATE LAY:**  Yes, I am.

27          **PRESIDING COMMISSIONER GARNER:**  All right.  And

8

1    you are not required to admit your offense or discuss

2    your offense if you do not wish to do so.  However,

3    this Panel does accept as true the findings of the

4    court and you are invited to discuss the facts and

5    circumstances of the offense if you desire.  The board

6    will review and consider any prior statements you've

7    made regarding the offense in determining your

8    suitability for parole.  At this time, I'll ask

9    Commissioner Sellwood if there's confidential material

10   in your Central File and if we'll be using it at

11   today's hearing.

12       **DEPUTY COMMISSIONER SELLWOOD:**  There is some

13   confidential material.  I do not believe it's relevant

14   to today's hearing.

15       **PRESIDING COMMISSIONER GARNER:**  Okay.  Thank

16   you.  The hearing checklist make it's way around

17   counselors?

18       **ATTORNEY TARDIFF:**  Yes, I have all the stuff

19   here.  Thank you.

20       **PRESIDING COMMISSIONER GARNER:**  Okay.

21       **DEPUTY DISTRICT ATTORNEY MEYER:**  So do I.  Thank

22   you.

23       **PRESIDING COMMISSIONER GARNER:**  Very good.

24   Thank you.  Okay.  Ms. Tardiff, do you have any

25   additional documents?  We found some in the pending

26   file.

27       **ATTORNEY TARDIFF:**  Right.  No.

9

1          **PRESIDING COMMISSIONER GARNER:**  Any preliminary

2    objections that need to be made?

3          **ATTORNEY TARDIFF:**  None.

4          **PRESIDING COMMISSIONER GARNER:**  And will Mr. Lay

5    be speaking with the Panel today?

6          **INMATE LAY:**  No.

7          **ATTORNEY TARDIFF:**  Everything but the commitment

8    offense.

9          **PRESIDING COMMISSIONER GARNER:**  All right.  Very

10   good.  Mr. Lay has exercised his right not to speak of

11   the commitment events, which is certainly a right not

12   to.  You will be discussing other matters with the

13   Panel today, so if I could get you to raise your right

14   hand please.

15         **INMATE LAY:**  Yes, sir.

16         **PRESIDING COMMISSIONER GARNER:**  Do you solemnly

17   swear or affirm the testimony you give at this hearing

18   will be the truth, the whole truth and nothing but the

19   truth?

20         **INMATE LAY:**  Yes, sir.

21         **PRESIDING COMMISSIONER GARNER:**  All right.

22   Thank you.  All right.  What I'll do is I will put into

23   the record a summary of the commitment offense and this

24   one is a little bit dicey, the crime.  So, what I'm

25   going to do is I'm actually going to be using the

26   version that was contained in the probation officer's

27   report, which was filed on July 13, 1989.  The filing

10

1    reference number is C, like Charles, 003590.  And facts

2    as dictated are;

3              "On March 25, 1987 around noon, Lydia,

4              L-Y-D-I-A, Lundy, L-U-N-D-Y, was

5              returning home after a walk with her

6              baby.  As she approached her house she

7              passed by a green pick-up truck parked

8              in front of the field next door.  She

9              noticed the personalized license plates

10             that said, BABIONE, B-A-B-I-O-N-E.

11             Defendant was sitting in the truck.

12             Lundy's front door was on the side of

13             the house and faces the field.  After

14             she entered the house, she noticed the

15             defendant had gotten out of the truck

16             and was standing at a four-foot tall

17             utility box fixture in the field near

18             her front yard.  She couldn't see his

19             hands.  It appeared as if he were

20             making a notation.  She was looking

21             down towards his hands and then out

22             into the field, then down again.  He

23             was looking down at his hands, then out

24             into the field and then down again.

25             She watched him for about a minute and

26             then turned away and went into the

27             bathroom to tidy up.  From the

11

1       bathroom, she heard a shot and she

2       returned to the window.  The defendant

3       was running along the edge of her

4       property next to the field, toward his

5       truck with a silver pistol in his hand.

6       Before he reached the truck, a woman

7       ran out of the field and into Lundy's

8       yard.  The woman saw Lundy and ran to

9       the front door.  When Lundy opened the

10      door it the woman ran in and said that

11      her husband had been shot in the head.

12      Lundy telephoned the authorities.  The

13      woman who appeared hysterical ran back

14      outside.  The truck had driven away.

15      On the day of the incident, Marjorie

16      King heard a woman scream, "Someone

17      help me, he's been shot."  Earlier that

18      day, between nine and ten on that

19      morning, she had seen the green pick-up

20      with a personalized plates parked by

21      the field adjacent to Lundy's yard.

22      King had seen it parked there abouts on

23      more than a dozen occasions, beginning

24      at the end of December 1986 or the

25      beginning of 1987.  Officer Stanley

26      Acevedo, A-C-E-V-E-D-O, of the

27      Sacramento County Sheriff's Department

12

1          arrived at the scene at 12:36 p.m.

2          Ambulance attendants were treating the

3          man who had been shot.  Acevedo spoke

4          with the man's wife, Joan Perry, P-E-R-

5          R-Y, and with Lundy and King.

6          12:48 p.m., Officer Walter Jackson of

7          the Sacramento County Sheriff's

8          Department stopped the green pick-up

9          twelve or thirteen miles from the scene

10         of the shooting.  Defendant was

11         driving.  He was arrested.  Michael

12         Perry, Joan Perry's husband, died the

13         next day of a gunshot wound to the

14         head.  He had been shot behind the left

15         ear and a bullet traveled left to right

16         and upward.  The muzzle was probably

17         two to three feet from the point of

18         entry.  The defendant's home was

19         searched and a pistol, not the murder

20         weapon, was seized.  The seized pistol

21         was registered to Michael Perry.  The

22         defendant's fingerprints were found on

23         a cigarette package next to the utility

24         box."

25    I'll put into the record a summary of a

26    statement that Mr. Lay made and this was

27    contained in the May 2002 board report.  And

13

1    this was done by correctional counselor Morton,

2    M-O-R-T-O-N.  Yes, Ms. Tardiff.

3              **ATTORNEY TARDIFF:**  The '05, yeah.

4              **PRESIDING COMMISSIONER GARNER:**  '03, or excuse

5    me, '02.  I'm sorry.

6              **ATTORNEY TARDIFF:**  Okay.

7              **PRESIDING COMMISSIONER GARNER:**  On March -- this

8    indicates inmate Lay presented to this counselor the

9    following version of the crime in writing.

10              "On March 24, 1987, I shot Michael

11              Perry which caused him to die later in

12              the hospital.  Joan Perry asked me to

13              kill her husband for a sum of money.

14              We planned the crime together and I'm

15              solely responsible for carrying out the

16              murder.  Without my participation in

17              the heinous crime, Michael Perry would

18              still be alive today.  The only excuse

19              I can offer is that (inaudible) very

20              weak.  I was going through my second

21              divorce and I thought the whole world

22              was against me.  My wife wouldn't let

23              me see my children because of false

24              charges filed by her in court.  I was

25              very depressed to the point where I

26              tried to kill myself.  I sometimes wish

27              I had succeeded and Michael Perry would

14

1        be alive today.  I can't undo the

2        heinous crime I committed against God

3        and man's laws but I know I'll never

4        let myself get that low ever again.  I

5        am not a career criminal, nor would I

6        ever become one because I've always

7        believed in the law.  I was raised that

8        way by mom and dad.  I grew up wanting

9        to be a peace officer with the

10       California Highway Patrol, but that was

11       not meant to be.  I was my own worst

12       enemy and I failed to take

13       responsibility and control of my life.

14       I went out of control and committed

15       this heinous crime.  At the top each, I

16       go to church and bible studies when I

17       was growing up as a youth.  I strayed.

18       Since I've been in prison, I've gone

19       back to the teachings and the bible and

20       the Lord himself.  So many ways I can't

21       explain to you, I have not completely

22       forgiven myself for my sins but

23       hopefully in time I will.  I will live

24       a peaceful life when I get out, this is

25       a promise I've made to God and I now

26       make the same promise to you.  I am

27       going to continue going to church when

15

1          I get out so I can continue being a God

2          loving person and a positive force on

3          the street."

4   As far as the prior record, Mr. Lay I note that as a

5   juvenile you didn't have any record.

6          **INMATE LAY:**  No, sir.

7          **PRESIDING COMMISSIONER GARNER:**  And I note that

8   adult convictions, you had one on May 13th, 1982.  This

9   was for a welfare fraud.  You got five years probation

10  and ordered to serve 120 days in jail.  Did you serve

11  the whole time or did they reduce the sentence?

12         **INMATE LAY:**  No, I served the whole time.

13         **PRESIDING COMMISSIONER GARNER:**  All right.  And

14  this was your continuing to receive welfare benefits

15  and food stamps during the period of time that you were

16  gainfully employed.

17         **INMATE LAY:**  Yes.

18         **PRESIDING COMMISSIONER GARNER:**  Then April 23rd,

19  1984 there was a charge of spousal rape by force,

20  threat or fear, sodomy and sexual battery.  You were

21  convicted of the sexual battery and you got three years

22  probation and ordered to serve 120 days in the county

23  jail.  Did you also do these 120?

24         **INMATE LAY:**  Yes, sir.

25         **PRESIDING COMMISSIONER GARNER:**  And I can go

26  back to the rap sheet, but where did these occur, what

27  county?

16

1          INMATE LAY:  Sacramento County.

2          PRESIDING COMMISSIONER GARNER:  Sacramento

3     County?

4          INMATE LAY:  Yes, sir.

5          PRESIDING COMMISSIONER GARNER:  And this was --

6     the first one resulted in a period of probation of five

7     years.  You were still on probation when you had the

8     second offense in April of '84, or had they modified

9     it?

10         INMATE LAY:  I honestly don't recall.

11         PRESIDING COMMISSIONER GARNER:  Okay.  I'll take

12    a look later, but it does indicate that five years

13    probation ordered on May 13th, of '82 and the next

14    offense coming April 23rd, of '84.  You only had a about

15    period of less than two years lapse, so my suspicion is

16    there still may have been some considerable probation

17    time.  Now this is all going to be dated by about four

18    years.  So when this was done, you were 57 so you've

19    got to be about 61 now?

20         INMATE LAY:  Yeah, I'm 61.

21         PRESIDING COMMISSIONER GARNER:  Not bad.  Quick,

22    born, correct birthday February 12th, '45?

23         INMATE LAY:  Yes, sir.

24         PRESIDING COMMISSIONER GARNER:  And it says San

25    Joaquin County, what city?

26         INMATE LAY:  That's Stockton.

27         PRESIDING COMMISSIONER GARNER:  Stockton,

17

1    County Hospital?

2            INMATE LAY:  No, actually the marine base there,

3    I mean naval base.  Excuse me.

4            PRESIDING COMMISSIONER GARNER:  And you were

5    raised in the Sacramento area by your parents?

6            INMATE LAY:  Yes.

7            PRESIDING COMMISSIONER GARNER:  What'd your dad

8    do?

9            INMATE LAY:  He worked at the Campbell Soup

10    Company.

11            PRESIDING COMMISSIONER GARNER:  Okay.  And mom

12    work?

13            INMATE LAY:  She worked sometimes in food

14    preparation for the school, for the schools around

15    Sacramento.

16            PRESIDING COMMISSIONER GARNER:  Brothers and

17    sisters?

18            INMATE LAY:  Yes, I have three brothers and one

19    sister.  One brother died a year ago last October.

20            PRESIDING COMMISSIONER GARNER:  So your two

21    brothers are still living and one sister?

22            INMATE LAY:  Yes.

23            PRESIDING COMMISSIONER GARNER:  They still in

24    the Sacramento area or they relocate?

25            INMATE LAY:  Well, I've got one brother that's

26    living in Modesto.  The other brother works and lives

27    in Bakersfield and my sister I'm not sure about if

18

1    she's still in Sacramento.

2         **PRESIDING COMMISSIONER GARNER:**  Okay.  You

3    married in '63 and there were three children from that

4    marriage.  That marriage end in divorce?

5         **INMATE LAY:**  Yes.

6         **PRESIDING COMMISSIONER GARNER:**  And then you

7    remarried again in '72 and three more children.  And

8    again, I find the record (inaudible) was terminated by

9    divorce.  And contact with children?

10        **INMATE LAY:**  I did until about four years ago.

11   I used to get letters all the time from one of my

12   younger daughters.  Nothing as of lately.

13        **PRESIDING COMMISSIONER GARNER:**  Do you know why

14   it stopped?

15        **INMATE LAY:**  Drugs.  She went to prison a couple

16   times.

17        **PRESIDING COMMISSIONER GARNER:**   Okay.  So she

18   was having some troubles?

19        **INMATE LAY:**  Oh yeah, that's drugs.

20        **PRESIDING COMMISSIONER GARNER:**  Okay.  You

21   graduated from high school in '76?

22        **INMATE LAY:**  No, '63.

23        **PRESIDING COMMISSIONER GARNER:**  What high

24   school?

25        **INMATE LAY:**  Norton Del Rio.

26        **PRESIDING COMMISSIONER GARNER:**  And there's a

27   record about attending college in LA for a period of

19

1    one year, sir.

2         **INMATE LAY:**  Yes, I did.  I got my AA out of LA

3    State way back when.  I don't have the paperwork to

4    prove it but --

5         **PRESIDING COMMISSIONER GARNER:**  LA State or City

6    College?

7         **INMATE LAY:**  County or it was a city college.

8         **PRESIDING COMMISSIONER GARNER:**  A two-year

9    degree.

10        **INMATE LAY:**  Yeah, it was two-year degree.  I

11   got it all in one year because I went to some day

12   classes.

13        **PRESIDING COMMISSIONER GARNER:**  Ever try to

14   write them to try to get proof in writing?

15        **INMATE LAY:**  Yes, I have.  I've written them and

16   the education department here wrote them and just for

17   some reason, there's no record of it.  I've got records

18   of it myself but it's all piled in a storage shed

19   somewhere.

20        **PRESIDING COMMISSIONER GARNER:**  And prior to

21   incarceration, you were employed as a truck driver and

22   that you were in the Teamsters Union.

23        **INMATE LAY:**  Yes.

24        **PRESIDING COMMISSIONER GARNER:**  Short haul or

25   long haul?

26        **INMATE LAY:**  I did a little of both.

27        **PRESIDING COMMISSIONER GARNER:**  Both?

20

1         INMATE LAY:  Yes.

2         PRESIDING COMMISSIONER GARNER:  You served in

3    the army.

4         INMATE LAY:  Yes.

5         PRESIDING COMMISSIONER GARNER:  '63 to '65.

6         INMATE LAY:  Yes.

7         PRESIDING COMMISSIONER GARNER:  And you first

8    got out as undesirable but you got it upgraded

9    honorable.

10        INMATE LAY:  Yes.

11        PRESIDING COMMISSIONER GARNER:  What allegations

12   did they use to give you the undesirable?

13        INMATE LAY:  I was having a lot of growing up

14   problems (inaudible) I guess you would say.  I was just

15   away from home and found out my wife was cheating on me

16   and that's why I had problems there.

17        PRESIDING COMMISSIONER GARNER:  And what --

18   where'd you serve?

19        INMATE LAY:  Most of the time was spent right

20   here in the states.  I went to Germany, (inaudible)

21   Germany and was there about five or six months,

22   something like that.

23        PRESIDING COMMISSIONER GARNER:  What'd they

24   train you to do?

25        INMATE LAY:  Trained me in -- well, it was all

26   infantry.  I was trained in all kinds of different

27   weapons.  I was trained on driving different things,

21

1    personal carriers, like that.  Basically, that's my

2    advanced infantry training.

3         **PRESIDING COMMISSIONER GARNER:**  Ever

4    hospitalized for anything?

5         **INMATE LAY:**  Yeah, one time for trying to kill

6    myself.

7         **PRESIDING COMMISSIONER GARNER:**  And how old were

8    you then?

9         **INMATE LAY:**  Forty-one I believe it was or

10   something along that line.

11        **PRESIDING COMMISSIONER GARNER:**  (inaudible)

12   doing that, were you in or out?  Were you in here or on

13   the outside?

14        **INMATE LAY:**  Oh no, I was on the outside.

15        **PRESIDING COMMISSIONER GARNER:**  You were on the

16   outside.

17        **INMATE LAY:**  Yeah.

18        **PRESIDING COMMISSIONER GARNER:**  And was that

19   back when one of the marriage break ups?

20        **INMATE LAY:**  Yeah, the last one.

21        **PRESIDING COMMISSIONER GARNER:**  Any contact with

22   either of the ex-spouses?

23        **INMATE LAY:**  I just recently wrote them both a

24   couple a letters letting them know that I've forgiven

25   them.  I did have copies of the letters, but thanks to

26   a cellie spilling coffee all over my paperwork, I don't

27   have anything.

1      **PRESIDING COMMISSIONER GARNER:**  Did you get a

2   response from either?

3      **INMATE LAY:**  No, this was just like six, seven

4   months ago.  I really don't expect anything from

5   either.  From what I understand, my ex best friend had

6   two heart attacks, he's got some physical problems and

7   I guess he's in Alzheimer's pretty deep and my ex-wife

8   don't want to talk with me anymore and I know that.

9   But I did what I needed to do for me.

10      **PRESIDING COMMISSIONER GARNER:**  Okay.  I had

11   another question but it just quickly evaporated.  So,

12   what I'm going to do for the time being I'm going to

13   ask Commissioner Eng to speak to you about your parole

14   plans and letters of support or opposition and then

15   come back, Commissioner.

16      **COMMISSIONER ENG:**  Mr. Lay, tell me something

17   before I get into the (inaudible) letters, tell me what

18   your parole plans are?

19      **INMATE LAY:**  Well, the way things stand right

20   now, at this very moment, the only thing I can look

21   forward to is retirement, Social Security, my Veterans

22   money to come in, Teamsters.  Just finding a place

23   somewhere where I can be cared for or I could --

24   something along that line.  It's kind of hard to say

25   I'm going to go out there and get a job and go to work.

26   My brother told me he could get me a warehouse job

27   driving a forklift, which I have tons of experience in

23

1    but I don't know if I can even do it.  The way I am,

2    the situation I'm in now.

3        **COMMISSIONER ENG:**  Right.

4        **INMATE LAY:**  I can't even get medical or do

5    anything to help me with my back.  It's a major problem

6    right now.  I can't get a referral out of this

7    institution to see a specialist.  So that kind of

8    limits what I can do out there.

9        **COMMISSIONER ENG:**  Do you have any idea in terms

10   of what type of benefits you're entitled to in the

11   three areas that you mentioned, with the Veterans, with

12   the Teamsters and the Social Security?

13       **INMATE LAY:**  The Veterans group is a $1000 a

14   month.  With the Teamsters, I'm not sure of.  I've got

15   almost 20 years and I know I've got something coming

16   there but I'm not -- you know what I'm saying.  I've

17   written them and it's hard to get anything out of them.

18   And I wrote a letter to the SSI, Social Security

19   Administration, about seven months ago and I didn't get

20   a response up until about three months ago.  So I put

21   in another request but as far as I know, the SSI

22   benefits is just over $800 a month.  That's about the

23   best I can tell you on that.

24       **COMMISSIONER ENG:**  I'm assuming, well, you said

25   that there was a little incident in your cell where

26   your paperwork was damaged.  Did you -- I'm not sure

27   how that works, copies of those letters can they put

24

1   those into their C File?

2       **PRESIDING COMMISSIONER GARNER:** Did you have any
3   of the letters that were damaged by the coffee, had you
4   given those to your counselor to put in your C File?

5       **INMATE LAY:** I just -- yeah -- I was going to
6   bring them in and set them right here on this and he
7   spilled it and then didn't even bother cleaning it up.
8   I've got book reports and other self-help stuff. I've
9   got to say, my luck's still running bad.

10      **COMMISSIONER ENG:** Okay. All right. Well, at
11  least we do have two copies, copies of two letters that
12  you received. And one of them is from your mother and
13  your father. How old are they, sir?

14      **INMATE LAY:** My dad is 84 and my mom is 80.
15  They are in very bad failing health but there still
16  hanging in there.

17      **COMMISSIONER ENG:** And where do they live?

18      **INMATE LAY:** There in Modesto.

19      **COMMISSIONER ENG:** They are in Modesto. So
20  there not in Sacramento?

21      **INMATE LAY:** No, they moved out of Sacramento
22  because the rent was just to high for them to survive
23  where it is.

24      **COMMISSIONER ENG:** Well, the letter I have is
25  dated October 12th, 2006 and unfortunately, I did not
26  see an address on here. But, they do say that they
27  would help you find senior housing if you're not

25

1   allowed to live with them. And they state that they do

2   have a spare bedroom and that they will make sure that

3   you always have clean clothing and they would go and

4   do anything they could to get you medical help with

5   what ever you need. So, it's nice to know, 84 and 80

6   that they're there for you.

7           **INMATE LAY:** Yeah, they've been there all the

8   way for me.

9           **COMMISSIONER ENG:** And then the other letter

10  that we have here, dated October 10th, 2006 is from your

11  brother and sister-in-law. Brother Kenneth L. Lay

12  living in Modesto.

13          **INMATE LAY:** Yes.

14          **COMMISSIONER ENG:** So, are they neighbors, do

15  they live in the same area?

16          **INMATE LAY:** They're two doors down, that's one

17  of the main reasons my parents moved to Modesto, to be

18  near my brother so they could help.

19          **COMMISSIONER ENG:** All right. Okay. So, in

20  this letter your brother and sister-in-law state that

21  they're willing to help you in all ways, housing, food,

22  clothing, meds. And if you are able to hold a job, I

23  guess your brother states that he's got a few

24  connections in warehouses and factories. And also owns

25  his own trucking business. But it appears that you've

26  got their full support also.

27          **INMATE LAY:** Yes, ma'am.

26

1    **COMMISSIONER ENG:** So is it our understanding

2    that you would like to, if and when you're given a date

3    you would like to re-locate to Modesto?

4    **INMATE LAY:** Yes, ma'am. Would be like a fresh

5    start. Be away from Sacramento, I lived there most of

6    my life. Modesto has a new start.

7    **COMMISSIONER ENG:** Okay. What county is

8    Modesto?

9    **DEPUTY COMMISSIONER SELLWOOD:** Stanislaus.

10    **COMMISSIONER ENG:** Stanislaus. Okay. Well, we

11    wouldn't have to -- we'd be able to work that instead

12    of back to Sacramento County.

13    **INMATE LAY:** Thank you. I appreciate it.

14    **COMMISSIONER ENG:** Is there anything that you

15    can think of that I may have missed that you would like

16    to add in terms of your parole plans?

17    **INMATE LAY:** You pretty well covered everything.

18    It's kind of -- I know it's a little wishy washy

19    because of the way my health is right now. I'm afraid

20    that's just the way I'm stuck for now. I'm sorry but

21    that's the way it is.

22    **COMMISSIONER ENG:** You know that no matter what,

23    if and when people are given a date that they're

24    (inaudible) to parole than you and then there's a

25    confirmation (inaudible).

26    **INMATE LAY:** I heard that from parole officers.

27    **COMMISSIONER ENG:** Right, okay. Do either

27

1    Commissioner's have any questions about the parole

2    plans?

3          **DEPUTY COMMISSIONER SELLWOOD:**  I don't about the

4    parole plans but I (inaudible) questions.

5          **PRESIDING COMMISSIONER GARNER:**  What's the heart

6    problem that is noted in your psych report?

7          **INMATE LAY:**  Well, I had a heart attack in

8    September 2005 and the bottom of my arteries and the

9    doctor went in there to do a five way bypass and my

10   heart (inaudible) and I've got maybe another four or

11   five years and that's all I've got.

12         **PRESIDING COMMISSIONER GARNER:**  Did the disease

13   result in particular damage to the muscle?

14         **INMATE LAY:**  He said, he told me what was going

15   on there but back at that point I was still pretty

16   heavily sedated on medications.

17         **PRESIDING COMMISSIONER GARNER:**  Well, you've got

18   two conditions, ones chronic and the others electrical

19   and they took care of functions.

20         **INMATE LAY:**  Yes, they do.

21         **PRESIDING COMMISSIONER GARNER:**  So did they give

22   you any indication what the other one's called?

23         **INMATE LAY:**  He told me something about some the

24   some disease or something.  I tried to get a copy of

25   the medical form up here, but they don't have anything

26   on the diagnosis and what exactly the doctor at French

27   Camp told me in other words.  I wrote the French Camp

28

1   asking them for something and --

2       **PRESIDING COMMISSIONER GARNER:**  Were you at

3   Doolden (phonetic)?

4       **INMATE LAY:**  Excuse me?

5       **PRESIDING COMMISSIONER GARNER:**  Where were you

6   when you went to the hospital for this?

7       **INMATE LAY:**  I was at French Camp in San Luis

8   Obispo.

9       **PRESIDING COMMISSIONER GARNER:**  Oh, all right.

10      **INMATE LAY:**  They had to transport me from

11  Trinidad down there because the institution was having

12  an argument over there fees or something, or getting

13  paid on time, Salinas Valley that is.

14      **PRESIDING COMMISSIONER GARNER:**  Salinas Valley

15  Hospital down in San Luis Obispo.  Been there, nice

16  little valley.

17      **INMATE LAY:**  Wasn't a very nice trip for me,

18  I'll tell you.

19      **PRESIDING COMMISSIONER GARNER:**  Okay.  And then

20  currently they have you on some medications for that?

21      **INMATE LAY:**  I got blood thinners and all --

22      **PRESIDING COMMISSIONER GARNER:**  With (inaudible)

23  or something in it like that?

24      **INMATE LAY:**  Actually, I couldn't tell you.  I

25  got 13 different medications that I take twice and

26  three times a day.  So it's hard to keep up on all of

27  those.

1          PRESIDING COMMISSIONER GARNER:  Okay.  I don't

2     want to speak to the commitment offense but I want to

3     ask you a question, if you know Mr. Perry?

4          INMATE LAY:  No, sir.  I did not know him.

5          PRESIDING COMMISSIONER GARNER:  Okay.  No other

6     questions.  Commissioner Sellwood.

7          DEPUTY COMMISSIONER SELLWOOD:  Thank you.

8          PRESIDING COMMISSIONER GARNER:  Here's your

9     opportunity, he's going to talk to you about your post

10    conviction factors.  I'll ask you to direct your

11    attention over there please.

12         INMATE LAY:  Okay.

13         DEPUTY COMMISSIONER SELLWOOD:  Good afternoon,

14    sir.  Glad you brought your hearing aid today.  All

15    though that thing worked pretty well the other day,

16    didn't it?

17         INMATE LAY:  Yeah, I'm sure it did.

18         DEPUTY COMMISSIONER SELLWOOD:  Okay.  Your

19    current classification level is 19 and your custody

20    level is medium-AR.

21         INMATE LAY:  Yes.

22         DEPUTY COMMISSIONER SELLWOOD:  Your last hearing

23    was October of '05.  Received a one-year denial and

24    that was your fourth subsequent hearing.

25         INMATE LAY:  Yes.

26         DEPUTY COMMISSIONER SELLWOOD:  You were received

27    here on April 1st, 1998.

30

1        **INMATE LAY:** Yes, that is correct.

2        **DEPUTY COMMISSIONER SELLWOOD:** I forgot to say

3    to you, but I need to say that I'm going to cover some

4    information from a variety of sources. If I make a

5    mistake, if I leave something out, please let me know.

6    We need to make sure the record is correct.

7        **INMATE LAY:** Okay.

8        **DEPUTY COMMISSIONER SELLWOOD:** Thank you. In

9    regards to your disciplinary history, you have quite a

10   good disciplinary history. In regards to 128's, there

11   are five of those, with two of them occurring in the

12   same month of '01, March of '01. The first one for a

13   smoking policy and the second one for responsibility

14   for count.

15       **INMATE LAY:** Oh, yes, I remember those.

16       **DEPUTY COMMISSIONER SELLWOOD:** Both in March of

17   '01.

18       **INMATE LAY:** Yes.

19       **DEPUTY COMMISSIONER SELLWOOD:** And the only 115

20   that you have, only one in your entire history was from

21   May of 1992, as a result of a physical altercation.

22       **INMATE LAY:** Yes, I remember that also.

23       **DEPUTY COMMISSIONER SELLWOOD:** Okay. But that

24   115 is 14 years old, so, 14 and a half years old.

25   You've done very well not to get any other 115's. You

26   are to be commended on that, sir.

27       **INMATE LAY:** Thank you.

31

1      **DEPUTY COMMISSIONER SELLWOOD:**  It's not been

2    that long since your last hearing.  What I'm doing is

3    covering -- generally covering information from the

4    last hearing.  So there's not all that much.  There's

5    one part of the report here, says that in regards to

6    vocational training, none since the last hearing,

7    academics, none, work, none since the last hearing.

8    Group activities, none.  In regards to psychiatric

9    treatment, they state that you did complete a book

10   report and that's one that didn't get coffee on it.

11      **INMATE LAY:**  No, sir.

12      **DEPUTY COMMISSIONER SELLWOOD:**  Now the book

13   report on I'm Okay, You're Okay.  Says you read a book

14   and did a book report on that.

15      **INMATE LAY:**  Yes.

16      **DEPUTY COMMISSIONER SELLWOOD:**  That's excellent,

17   sir.  And your behavior remained clear through that

18   time period.  Now, what I'm going to do is go through

19   the psychiatric reports and basically it talks about

20   your diploma, you did get a diploma and you did get the

21   AA degree.  You have a 12.9 grade point level, which

22   speaks to a good ability to read and write.

23      **INMATE LAY:**  Yes.

24      **DEPUTY COMMISSIONER SELLWOOD:**  And comprehend.

25   Okay.  And regards to substance abuse history, it

26   refers me -- I'm sorry.  Let me tell you what I'm

27   reading from, it makes sense then.  A September 30th of

32

1   2003 psychiatric report and that report was authored by

2   Joe Reed, PHD, Staff Psychologist.

3           **INMATE LAY:**  Yes.

4           **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  And then

5   Counsel you would agree that that's our most recent PO

6   to read?

7           **ATTORNEY TARDIFF:**  Yes.

8           **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  So it

9   refers me back to the '99 report, to talk about

10  substance abuse history.  But I wanted to go back to

11  that because it had some interesting statements about

12  AA.  So under substance abuse history, of the report

13  authored by Joe Reed again, Staff Psychologist on

14  December 11th of 1999.  This inmate's records indicate

15  no history of substance abuse.  However, and to his

16  credit, he regularly attended Narcotics Anonymous from

17  1990 until 1993 and he irregularly attended Narcotics

18  Anonymous from 1993 until 1998.  The inmate does not

19  appear to have a substance abuse problem.  And I

20  noticed that there was a mention somewhere else, that

21  you had not been able to attend NA because of an A2B

22  designation and it was only offered to A1A inmates.

23          **INMATE LAY:**  That is correct.

24          **DEPUTY COMMISSIONER SELLWOOD:**  But in looking at

25  your history, I noticed that from '98 to '02 you were

26  A1A, from '92 on you were A2B.  So he says that you

27  irregularly attended until '98 but you remained A1A

33

1    from '98 until '02. And in '02 you would have been

2    disallowed because of the A2B designation. So I was

3    wondering about that '98 to '02 period. Based on your

4    frown, you're not sure about that designation.

5            INMATE LAY: I'm trying to remember.

6            DEPUTY COMMISSIONER SELLWOOD: But I'll go back

7    and give you the review here as I see it. In twelve of

8    '02 you got an A2B but in nine of '02, ten of '02,

9    twelve or '98, twelve of '99 and six of '00, twelve of

10   '00 and twelve of '01, you got an A1A designation for

11   work crew at workers level.

12           INMATE LAY: Yes, I remember that.

13           DEPUTY COMMISSIONER SELLWOOD: So in a four-year

14   period when it appears you stopped NA but you were

15   still eligible and then in '02 you became ineligible.

16   Okay.

17           INMATE LAY: Yeah.

18           DEPUTY COMMISSIONER SELLWOOD: So I was just

19   wondering about that period for some reason.

20           INMATE LAY: I've been taking AA or NA.

21           DEPUTY COMMISSIONER SELLWOOD: Right, you have

22   since '90.

23           INMATE LAY: A lot of years.

24           DEPUTY COMMISSIONER SELLWOOD: Yeah.

25           INMATE LAY: And like you said, I didn't have

26   any substance abuse, which is true. I don't do drugs,

27   I don't drink alcohol of any kind, never have. It's

34

1  just something I don't do.  But anyway, the only reason

2  I got into the programs to begin with was because I

3  figured there had to be something in there, it's a

4  self-help program.  Something I could learn off of one

5  of the other guys in there that could benefit me, and I

6  did.  I just start over and go into it again.  I don't

7  know, I just got burnt out.

8      **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  So, it was

9  a decision on your part not the continue.

10      **INMATE LAY:**  That is correct.

11      **DEPUTY COMMISSIONER SELLWOOD:**  Okay.  Thank you.

12  And I did hear, what I thought was, in your discussion

13  about sending out letters to ex-wives.

14      **INMATE LAY:**  Yes.

15      **DEPUTY COMMISSIONER SELLWOOD:**  I thought I heard

16  you applying the steps when you talked about, I did

17  what I needed to do for me.

18      **INMATE LAY:**  Yes, sir.  Which, was the reason I

19  did it.  (inaudible) to do those things.  One of the

20  books that I read, it was -- now I can't remember the

21  name of it, I had it and just lost it.  Anyway, to

22  forgive was the last word on it and part of the book

23  was that very thing.  In order to forgive yourself

24  you've got to forgive the people that give you the

25  anger and all that.  It felt so good to write those two

26  letters.

27      **DEPUTY COMMISSIONER SELLWOOD:**  Yeah, I heard

1    that in your words when you were talking about it.

2    Okay. The other parts of the report, current

3    diagnostic impression Axis I, no contributory clinical

4    disorder. Axis II, no contributory personality

5    disorder. Inmate Lay's current level of insight and

6    judgment in general and specifically regarding the

7    commitment offense is good and supports a positive

8    prediction of successful adaptation to community

9    living. Assessment of dangerousness, his violence

10   potential within a controlled setting is considered to

11   be low compared to the average level two inmate

12   population. If released to the community, his violence

13   potential is considered to be low or no more than that

14   of the average citizen in the community. There are no

15   significant risk factors, which may be precursors to

16   violence for this individual. And many times we'll see

17   alcohol or drugs or whatever else would be a precursor

18   to potential violence. This is an in factual statement

19   that says there are no significant risk factors, which

20   may be precursors to violence. Okay. This inmate does

21   not have a mental disorder, which would necessitate

22   treatment either during incarceration or in the

23   community. Anything that I've missed or you'd like to

24   add or correct?

25          **INMATE LAY:** I think you've covered everything.

26          **DEPUTY COMMISSIONER SELLWOOD:** All right, sir.

27   Thank you. Commissioner.

36

1          **PRESIDING COMMISSIONER GARNER:** I believe that I

2   heard some discussion regarding substance abuse. But

3   I'd like to go back and make sure I've got an accurate

4   picture. Drugs or alcohol, at any point in your life

5   had they become a factor?

6          **INMATE LAY:** Not ever. I've never taken one

7   drink, never even smoked a joint, not ever. I got a

8   brother and a sister that that's there whole life and

9   the one that just died. Died at 52 because of drugs.

10  I got a daughter; I've got more than just one daughter

11  out there that's involved with drugs.

12         **PRESIDING COMMISSIONER GARNER:** But as far as

13  you, it's never been an issue?

14         **INMATE LAY:** I can promise you, it's never been

15  an issue with me.

16         **PRESIDING COMMISSIONER GARNER:** Just for the

17  record, I wanted to make sure.

18         **INMATE LAY:** No, I understand.

19         **PRESIDING COMMISSIONER GARNER:** Commissioners,

20  any follow up questions.

21         **DEPUTY COMMISSIONER SELLWOOD:** No, sir.

22         **COMMISSIONER ENG:** I have a few. I know that

23  you stated that how many years you attended AA and/or

24  NA. What specifically did it do for you?

25         **INMATE LAY:** Well, I guess I can refer to the

26  steps, the 12 steps you know, the first step is that

27  you recognize that there is a problem. And you've got

37

1    to recognize that there is a power greater than

2    yourself and you've got to remember that in order to

3    heal yourself, you've got to try to make amends with

4    people that you've done wrong or have done you wrong.

5         **COMMISSIONER ENG:**  Right, so what did you

6    recognize was the problem?

7         **INMATE LAY:**  The problem was, I was unhappy with

8    my life.  I didn't care about nothing, not myself, not

9    anybody else.  I think that's one of the reasons I like

10   driving trucks so much, I didn't have to deal with

11   people.  All I had to do was pick up a load here and

12   put it there.  I had a problem with -- I had an

13   antisocial disorder when I came to prison, it really

14   was.  It took a long time to get over that.  To go out

15   in the general population and make friends, play cards

16   with them, play dominos, chess, whatever.

17        **COMMISSIONER ENG:**  What type of relationship --

18   how would you describe the relationship that you had --

19   you had six children correct?

20        **INMATE LAY:**  Yes, ma'am.

21        **COMMISSIONER ENG:**  Right.  Describe the type of

22   relationship you had with those children?

23        **INMATE LAY:**  Well, the first three children with

24   my first wife, after we divorced she had moved to LA

25   and she took all three of the kids.  So I only got to

26   see those kids once in a blue moon.  And even after she

27   moved back to the Sacramento area, still basically the

38

1    same thing.  And as adults and they had rights and they
2    really didn't know me at all.  My younger kids, when I
3    came to prison they were still pretty young.  And as
4    far as I know, other than just the one daughter, the
5    other two won't have nothing to do with me because of
6    what I did.

7    **COMMISSIONER ENG:**  Okay.  And you also stated
8    that you have had anger against your wife.

9    **INMATE LAY:**  Oh yeah.  Just -- well, to tell it
10   best I guess I'm going to have to go with the first
11   one.  My first wife was very young when we got married.
12   She got pregnant, we got married.  I was already in the
13   army at the time.  I went overseas and I got these
14   letters from my so-called best friend telling me that
15   my wife wanted to divorce me so she could marry him.
16   And I think I could go from that.

17   **COMMISSIONER ENG:**  What about the second wife?
18   **INMATE LAY:**  The second one, I had the same
19   problem with the best friend again.  Went behind my
20   back when I'm making runs across country.  Gone for
21   days then and I was getting told by neighbors that this
22   person was coming over and that person and I found out
23   one day who it was and that ended that.

24   **COMMISSIONER ENG:**  Okay.

25   **INMATE LAY:**  That was the anger I had, I was
26   very, very angry.

27   **COMMISSIONER ENG:**  Okay.  I have no more

39

1    questions.

2         **PRESIDING COMMISSIONER GARNER:**  Thank you.

3    Mr. Meyer any questions you'd like to ask this

4    afternoon?

5         **DEPUTY DISTRICT ATTORNEY MEYER:**  No, thank you

6    Commissioner.

7         **PRESIDING COMMISSIONER GARNER:**  Ms. Tardiff, any

8    questions?

9                        (Tape side two)

10        **DEPUTY DISTRICT ATTORNEY MEYER:**  In closing I

11   would say as far as the commitment offense, you have a

12   crime that was committed in an especially heinous and

13   callous manner with absolute no regard at all for life

14   of another human being.  Suppose you could say it's

15   basic form, I mean what happened is that they executed

16   this man.  Apparently, Mrs. Perry or at least the

17   allegation, she had some interest to be rid of him and

18   brings Mr. Lay into the picture to actually do the

19   shooting.  He does it for money.  I mean that's about

20   as low a reason to do anything as you could, especially

21   something like that.  They plan the event, set Mr.

22   Perry up and Mr. Lay shot him and killed him.  You've

23   got really an inexplicable motive, greed the thing

24   driving it.  So, you've got a commitment offense that

25   just cries out for no real mercy.  His previous record,

26   the welfare fraud conviction.  Apparently he was

27   receiving benefits while working.  Received

40

1    approximately $6200 unlawful benefits.  And then in
2    1984 he had a sexual battery involving an attack on his
3    estranged wife.  He's already indicated he was having
4    trouble with her, it sounds like during that time
5    anyway.  So he had what sounds like some sort of anger
6    problem with her that took a course involving a violent
7    attack.  His institutional behavior as the Board has
8    noted, has been -- he's programmed well in the
9    institution setting.  He's had minimal number of
10   disciplinary matters, the last one in 1992, I believe
11   they said earlier.  The last 115, the only 115 in 1992
12   and two minor 128's in '01.  So he is to be commended
13   on his behavior inside the institution.  It appears
14   from what's come out at the hearing today, that his
15   physical problems and limitations that have limited a
16   lot of what he can do in terms of work and those kinds
17   of things.  The psychiatric report appears to be
18   positive and says that his violence potential in a
19   controlled setting is considered low.  He has no
20   alcohol or drug problems and that's certainly a good
21   thing.  But might cause him to digress if he were to be
22   released, so he's got that going for him.  His parole
23   plans, I realize his age is certainly a matter that
24   contributes to this plus his physical problems.  As he
25   indicated today, it's pretty much he's going to retire.
26   He will live on the benefits through Social Security
27   and Veterans and his association with the Teamsters.

41

1    And so it does appear that he will have a means of

2    supporting himself.  Right now his parents are showing

3    continued support, but at their age and he indicated

4    also in the hearing today, that they are both in

5    failing health.  How long that's going to be is

6    questionable.  It doesn't sound like he's got a lot of

7    other family.  The brother wrote a letter of support

8    but I'm not sure how old his brother is in relation to

9    himself and how long that's going to be there.  The

10   rest of his family isn't to supportive at all.  So,

11   there is a concern that he's going to be on his own.

12   The last thing that I would say is his indication about

13   his health and his heart attack and that his subsequent

14   discovery of further heart problems.  If he had some

15   documentation, some records that would support that, I

16   think that would certainly assist the Board in making

17   an overall evaluation.  It would seem that if that was

18   truly the case, that those records would be available.

19   It's his information and he'd be entitled to it.  In

20   conclusion, Mr. Lay that the underlying crime is the

21   thing that I would submit is most disturbing.  I mean,

22   this is as senseless an act as you could have.  And

23   while he's certainly done well in an institutional

24   setting, I'm not sure that I could say that I think

25   he's suitable for parole because there is still that

26   possibility of an unreasonable risk of danger to

27   society and a threat to public safety if he were to be

42

1    released at this time.  So I'm going to submit it to
2    the Board on that.

3        **PRESIDING COMMISSIONER GARNER:**  Okay.  Very
4    good.  Thank you.  Ms. Tardiff, closing please.

5        **ATTORNEY TARDIFF:**  Thanks.  In terms of
6    Mr. Lay's pre-incarceration history, it's favorable,
7    high school plus some college.  He has a stable work
8    history and 20 years as a heavy equipment operator.  He
9    had no substance abuse problems and he apparently came
10   from an intact, stable family.  In terms of the crime
11   itself, I would submit that strong mitigating factors,
12   crime of -- the circumstances around the committing
13   offense are extremely unlikely to reoccur, therefore
14   reducing the possibility of any type of activity,
15   criminal activity in the future.  This was really a
16   situational type crime.  Not to diminish the fact that
17   somebody lost their life but such circumstances are
18   unlikely to reoccur.  Since he's been incarcerated, he
19   has received when he's worked, average to above average
20   work reports.  Currently his self-help has consisted of
21   book reports.  His 115's are minimal at the very least.
22   One 115 in 1992, which is positive there.  He's only
23   had five 128's and the last ones were in '01.  So
24   that's almost four and a half years ago, it was March
25   of '01.  He doesn't have any mental health diagnosis.
26   There are no substance abuse issues, there are no risk
27   factors.  His psyches from '99 and '03 are supportive.

43

1     The '99 psych, I mean the '03 psych states that his

2     prognosis for community living appears to be very good.

3     No evidence of a mood or thought disorder.  His current

4     level of insight in general and specifically regarding

5     the commitment offense, is good and supports a positive

6     prediction of successful adaptation in community life.

7     Under review of the life crime, he admits full

8     responsibility for the death of the victim.  Goes on to

9     state that he insightfully noted that he was

10    exceptionally angry following his recent divorce and

11    separation from his children, which played a large part

12    in the current offense.  He did appear to be remorseful

13    and penitent for his crime and appears to understand

14    the damage done to the victim and the victim's family.

15    I'd also then I'd like to add as a second mitigating

16    factor of significant stress at that time in his life.

17    Under the assessment of dangerousness, he receives a

18    good assessment that's based on no juvenile criminal

19    history, no gang involvement, good pre-incarceration

20    work history, college and only the one 115 in '92.  He

21    was administered two psychological tests, the HCR20 and

22    the PCLR short version.  Both of those were favorable.

23    The HCR20 suggested a low prediction of future violence

24    and the PCLR it did not show the presence of

25    psychopathy.  If he's released to the community, it's

26    low, no significant risk factors.  And the '99 psych

27    eval is also supportive of release.  That stated he had

44

1   good prognosis of community living, no Axis I or Axis

2   II diagnosis.  His current level of insight and

3   judgment in general is good and supports a positive

4   prediction of successful adaptation in community

5   living.  Insightful in terms of the crime itself.

6   Showed good understanding and seemed penitent for his

7   crime.  Again, he got a low degree of risk if released

8   out into the community.  No significant risk factors

9   noted in that evaluation as well.  So, what we have

10  here then is several psych evals that are supportive of

11  release that go back seven years.  His parole plans, we

12  do have a couple of letters of support.  Again, he does

13  have marketable skills in the sense he was the heavy

14  equipment operator for 20 some years out in the

15  community, which he could always return to.  But in

16  either event, I do think that he probably would end up

17  being retired at this point.  He's got support from his

18  family.  He has housing, so all that's been taken care

19  of so his parole plans -- So I would submit that his

20  level of dangerousness is low at this point in his

21  life.  His age also reduces his risk of recidivism at

22  this time.  And that the suitability factors outweigh

23  the unsuitability factors.  Thank you.

24          **PRESIDING COMMISSIONER GARNER:**  All right.  Very

25  good.  Thank you.  Mr. Lay, if you choose this is your

26  opportunity to address the Panel on the subject of your

27  suitability for parole.

45

1          INMATE LAY:  Yes, sir.  There's one thing that
2   the District Attorney didn't bring out, is that for the
3   past several years, every hearing that I've had, Steven
4   Secrest, Assistant District Attorney and he's the one
5   that prosecuted me in this case.  He came to boards
6   every year in favor of me receiving a release date.  I
7   just wanted that on record.  Okay.  I am a 61 year-old
8   man and I am broken.  Got some physical problems that
9   need to be addressed, which hopefully I can do before I
10  get out of prison.  But if not, when I get out I do
11  want to get my body back in some kind of shape so I can
12  perform a job of some sort.  I don't really want to
13  retire, 61's just to young to retire as far as I'm
14  concerned.  My dad worked until he was seventy
15  something and they had to kick him out at very best and
16  that's what I want.  I want to inflict that.  I should
17  probably put at least a trailer on it and have some
18  place to live and the way I can do that it to get out
19  there and get back into condition and work.  And this
20  heart problem I've got, I'll have to work through that.
21  There's got to be a way for me to work in the condition
22  I'm in right now.  Doctors give me a limited time to
23  live with this problem.  That's something I've got to
24  live with to but that's me.  I'm telling you I'm not --
25  I promise you I'm not a risk for nobody just because of
26  my physical condition.  My brother is in age that's
27  just next to me.  He's two-years younger than I am and

46

1    he is with his letter, stated that he'll take care of

2    me.  We have always been close, me and my brother have.

3    I talk to his wife, my sister-in-law and she wants me

4    to live there with them.  There the only ones there

5    with mom and dad so, I know I've got a good thing

6    either way.  I'd like to take care of my parent's and I

7    would live with them, that's my first choice.  Please

8    know that I'm not a risk anymore.  That's all I've got

9    to say.

10          PRESIDING COMMISSIONER GARNER:  Okay.  Very

11    good.  Thank you.  It is 3:53 p.m. and we'll recess for

12    deliberations.

13                        --oOo--

14                   (Off the record)

15                        --oOo--

16          DEPUTY COMMISSIONER SELLWOOD:  We're back on the

17    record.

18          PRESIDING COMMISSIONER GARNER:  All right.  Very

19    good.  It's now 4:00 p.m. and some additional

20    information has surfaced subsequent to our recess and

21    Mr. Meyer, is there something else that you want to put

22    on the record for us please?

23          DEPUTY DISTRICT ATTORNEY MEYER:  Yes, thank you

24    very much Commissioner.  And this is really kind of a

25    follow up to a comment Mr. Lay made just before the

26    proceedings concluded about Mr. Secrest, who is actually

27    the prosecutor in the case.  And information that I was

47

1   not aware of but I do see now in a reference the

2   decision from June 5th, '02 hearing in which Mr. Secrest

3   not only provided a letter, he was also present.  In

4   which he said that or in the letter, that Mr. Lay had

5   provided special and extraordinary assistance to the

6   District Attorney's Office in the prosecution of the co-

7   defendant, Joan Perry, who was prosecuted some four to

8   five years later.  Who stood to gain over two hundred

9   thousand dollars from three different insurance policies

10  as a result of misconduct.  So, I would ask the board to

11  take that information into consideration in evaluating

12  Mr. Lay at this time, that he did provide assistance and

13  Mr. Secrest did feel that he was a suitable candidate

14  for a release date.

15          **PRESIDING COMMISSIONER GARNER:**  Okay.  Very

16  good.  Thank you.  It's now 4:02 p.m. and we will again

17  recess for deliberations.

18          **DEPUTY COMMISSIONER SELLWOOD:**  Commissioner, the

19  only other thing besides that statement on that, there

20  is other from the '04 hearing.

21          **PRESIDING COMMISSIONER GARNER:**  Do you want to

22  put it off record?

23          **DEPUTY COMMISSIONER SELLWOOD:**  And it's -- may I

24  take a break for just a moment to locate the essence of

25  it?

26          **PRESIDING COMMISSIONER GARNER:**  Okay.

27                      (Off the record)

48

1      **DEPUTY COMMISSIONER SELLWOOD:**  Okay.

2  Commissioner, per your request then.  What I'm going to

3  read from the March 2nd, 2004 hearing and I am reading

4  from page 39, on the bottom of the page, line 21, starts

5  with Deputy District Attorney Secrest.  Okay.  As I was

6  saying, I've never asked for an inmate to get a date at

7  a lifer hearing before and I've done a lot of them.  But

8  I would like you to give Mr. Lay a date.

9      **PRESIDING COMMISSIONER GARNER:**  Okay.  Thank

10  you.  And we'll go back off record and consider and

11  deliberate.

12                    R E C E S S

13                    --oOo--

14

15

16

17

18

19

20

21

22

23

24

25

26

27

49

1       CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3       DEPUTY COMMISSIONER SELLWOOD:  We are on the

4   record.

5       PRESIDING COMMISSIONER GARNER:  All right.  It

6   is 4:38 p.m. in the matter of Elwin Lay, CDC D David,

7   71078.  Mr. Lay, the Panel has reviewed all the

8   information received from the public and relied on the

9   following circumstances in concluding that you're

10  suitable for parole and wouldn't pose an unreasonable

11  risk of danger to society or a threat to public safety

12  if released from prison.  Now we've had a hard time

13  getting you to this point this week, sir.  But I think

14  we got you there.  Okay.  All right.  Okay.  Want to

15  take a minute?  First of all, I did want to note the

16  Panel did consider the gravity of the commitment

17  offense.  We've reviewed it and went back and looked at

18  the offense again, so this Panel is certainly aware of

19  all the aspects of the commitment offense and the

20  gravity contained thereof.  The Panel also noted that

21  you have no juvenile record of assaulting others and

22  while in prison you've enhanced your ability to function

23  within in the law upon release.  Your participation in

24  educational programs, we note that you did come in with

25  a high school diploma and unfortunately due to

26  circumstances, an unverified AA degree from LA Community

27  **ELWIN LAY  D-71078     DECISION PAGE 1     11/2/06**

1    College. The Panel noted that you've participated in AA
2    and NA and you do know it, you demonstrated that to us
3    today. The Panel also took note that your participation
4    in these programs were truly for self-help reasons,
5    because from every record that we have read there is no
6    issue of substance abuse, either alcohol or narcotics
7    that were an aspect of your life. Vocational programs,
8    we note that you came in with a 20-year history of work
9    and that your institutional job assignments show from
10   the review of the work records that you have a strong
11   work history. The last two that we noted were culinary
12   and textiles and we also took note that your ability to
13   work has been impacted by your disability. Which would
14   preclude you from participating in any kind of work.
15   The Panel noted that because of maturation, growth and a
16   greater understanding in your advanced age, that there's
17   a reduced probability of recidivism. The Panel also
18   took note of the health issues, that that would be
19   another factor in the likelihood of probability of
20   recidivism. We noted that you've got realistic parole
21   plans, will include family support. We note that you
22   have marketable skills. But again, the Panel also notes
23   that the greatest likelihood is that you will be a
24   participant in some kind of Social Security Benefits or
25   Disability. Also, the Panel noted that with respect to
26   the flexibility, having your parole plans you do have a
27   **ELWIN LAY  D-71078     DECISION PAGE 2     11/2/06**

51

1    pension from the Teamsters Union and with potential for

2    Social Security Benefits.  The Panel noted that you've

3    maintained close family ties while in prison, via

4    letters and visits.  The family has relocated to

5    Stanislaus County in the Modesto area.  You have your

6    mother and father and a brother living in close

7    proximity.  The Panel noted your goal is to live with

8    your mother and father and help them in their advancing

9    years.  The Panel noted that you've maintained positive

10   institutional behavior including a significant

11   improvement in your self-control, in that your last 115

12   was May 16th of 1992.  You've shown signs of remorse

13   indicating you understand the nature and magnitude of

14   the offense and you've accepted responsibility for the

15   criminal behavior and a desire to change the course of

16   citizenship.  We took note of this in a written version

17   that was read into the record today.  Also, from the

18   psychological report and also from the board reports.

19   Other information bearing upon unsuitability, is

20   information that was contained from various transcripts

21   and the first transcript I'm going to be reading from is

22   the June 5th, 2002 hearing, which was conducted here at

23   Soledad.  For the record, it was Commissioner Jones

24   Moore and Deputy Commissioner Gretchen Garner-Easter and

25   during this there was a comment from the representative

26   from the District Attorney's Office in Sacramento

27   **ELWIN LAY  D-71078    DECISION PAGE 3    11/2/06**

52

1    County, a Deputy District Attorney Secrest, S-E-C-R-E-S-
2    T.  In that he told a story at the trial, that she had
3    tried to get you'd kill her husband and that originally
4    agreed but then back out of it.  She told you that her
5    husband had been beating her and would leave her at a
6    field near the house, which he did.  As she walked
7    through the field, she motioned for you to come over and
8    approach -- the victim to come over and approach Mr. Lay
9    and at trial indicated that you didn't and she shot her
10   husband (inaudible).  We also took note from the March
11   2nd, 2004 transcript.  Again, this is District Attorney
12   Secrest and the Jones Moore was the Commissioner and
13   Robert Harmon, H-A-R-M-O-N, was the Deputy Commissioner.
14   During recess Mr. Lay and I had a talk and he broke down
15   in tears and confessed that he had in fact killed this
16   man.  Sidebar note, that we do have that on the record
17   today so far as the version of the crime.  And on the
18   eve of the trial she ultimately pled guilty.  She did
19   indeed have involvement in this case with you and guilty
20   of first-degree murder with vicarious use enhancement
21   and got 26 years to life and Mr. Secrest comment, that
22   he would not have been able to convict her at all
23   without your testimony.  Continuing, Deputy District
24   Attorney Secrest indicated, I've never asked for an
25   inmate to get a date at a lifer hearing before.  But I'd
26   like you to give Mr. Lay a date.  Most recently, the
27   **ELWIN LAY  D-71078    DECISION PAGE 4    11/2/06**

53

 1   October 25th, 2005, a transcript from that hearing.

 2   This was Commissioner Susan Fisher, Deputy Commissioner

 3   Rolando, R-O-L-A-N-D-O, Mejia, M-E-J-I-A.  And again,

 4   Deputy District Attorney Secrest indicated that I've

 5   never asked any court, any date for any lifer but I'm

 6   going to ask you to give Mr. Lay a date."  So we have

 7   some very consistent representations from Mr. Secrest.

 8   So far as the psychological reports that we've

 9   considered.  The first report we considered was from Dr.

10   Reed, in fact both of the reports are from Dr. Reed.

11   The first one is from September 2003 and the pertinent

12   portions of this report that support suitability is it's

13   Dr. Reed's contention that you were administered to

14   psychological tests.  Results from the HCR20 suggest a

15   low prediction of future violence.  Parenthetic to this

16   reference this category is the lowest possible category

17   available.  Results from the PCLR short version, does

18   not indicate the presence of antisocial pattern and that

19   if released to the community, your violence potential is

20   considered to be low or no more than that of the average

21   citizen in the community.  Consistency throughout, Dr.

22   Reed in December of 1999, which was the previous report,

23   indicated that if released to the community your

24   violence potential is considered to be no more than that

25   of the average citizen in the community.  So far as the

26   base term of confinement, the Panel noted that the base

27   **ELWIN LAY  D-71078    DECISION PAGE 5    11/2/06**

54

1     line offense for which you were convicted was murder in

2     the second degree, PC 187 and we will quickly -- but I

3     don't have it.  If someone could get me the date of the

4     crime.

5          **DEPUTY COMMISSIONER SELLWOOD:**  March 25th, 1987.

6          **ATTORNEY TARDIFF:**  Yip.

7          **DEPUTY DISTRICT ATTORNEY MEYER:**  October 7th.

8          **PRESIDING COMMISSIONER GARNER:**  The offense

9     occurring on May 25, 1987.

10         **ATTORNEY TARDIFF:**  March.

11         **PRESIDING COMMISSIONER GARNER:**  March?

12         **DEPUTY DISTRICT ATTORNEY MEYER:**  Two dates, the

13    District Attorney is offering a different date.

14         **DEPUTY COMMISSIONER SELLWOOD:**  The date of the

15    crime?

16         **PRESIDING COMMISSIONER GARNER:**  Date of the

17    crime.

18         **DEPUTY COMMISSIONER SELLWOOD:**  I'm sorry, March

19    25th, 1987.

20         **PRESIDING COMMISSIONER GARNER:**  The offense

21    occurred on March 25th, 1987.  Okay.  And the term

22    derived from the matrix located in the Title 15 is

23    2403C, which is the second-degree murder.  The offense

24    committed on or after November 8th, 1978 and the Panel

25    finds the category 3B is appropriate and that there was

26    no evidence of a prior relationship and death was almost

27    **ELWIN LAY  D-71078    DECISION PAGE 6      11/2/06**

55

1

2    immediate.  The Panel took the middle term, which is 228

3    months for the base offense.  The total term

4    calculation, the base life term was 228 months resulting

5    in a total term of 228 months.  Granted your post

6    conviction credit starting from the date the life term

7    started, which was November 24, 1987, with the date of

8    today's hearing, which is November 2nd, 2006.  We did

9    deduct four months from the one year that you had the

10   115.  That resulted in post conviction credits of 72

11   months, indicating a total period of confinement of 156

12   months.  So, you have paid your time.  Special

13   conditions of parole, the Panel is going to order the

14   parole be to Stanislaus County and the reason for the

15   decision of the special condition is that in our

16   assessment that is where you have your strongest support

17   system and the greatest likelihood of success while

18   being on parole.  All right.  With that I'll ask my

19   fellow Commissioners if there's any additional comments

20   or if there is something that we need to supplement the

21   record with.

22        **DEPUTY COMMISSIONER SELLWOOD:**  No.

23        **PRESIDING COMMISSIONER GARNER:**  The absence of

24   any other special conditions, normally we'd very

25   generally find a lot of special conditions that are

26   related to substance abuse, such as alcohol or

27   **ELWIN LAY  D-71078    DECISION PAGE 7    11/2/06**

56

1    narcotics.  We have no evidence before us that those

2    would be appropriate conditions to impose.

3         **ATTORNEY TARDIFF:**  Can I add that the Secrest,

4    the District Attorney was also the trial attorney.  So

5    he was intimately familiar with the facts of the case

6    and the parties.

7    //

8    //

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   **ELWIN LAY  D-71078     DECISION PAGE 8     11/2/06**

57

1          PRESIDING COMMISSIONER GARNER:  Very good.

2     Thank you.  All right.  One thing we're going to

3     encourage you to do is there are a lot of mean, spirited

4     people that live here and they would love nothing more

5     to do than to engage you in some activity that might

6     jeopardize the date that we're proposing for you.  We

7     also know that you're starting on a trip right now and

8     that trip still has a couple other folks that are going

9     to have an opportunity to review it.  I'm hopeful we've

10    created a record that would stand the scrutiny of review

11    but until that process runs itself out, I encourage you

12    to kind of keep a low profile.  And I'll hope again,

13    that given the record -- it's your record, all we're

14    doing the report it.  It's what you've done, it's not

15    what we've done.  So with that I'm going to go ahead and

16    note that it is now 4:50 p.m. and that concludes this

17    hearing.

18                    A D J O U R N M E N T

19                         --oOo--

20

21

22                              PENDING REVIEW

23    PAROLE GRANTED           AND APPROVAL

24    THIS DECISION WILL BE FINAL ON:_____

25    YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26    DATE, THE DECISION IS MODIFIED.

27    ELWIN LAY  D-71078    DECISION PAGE 9    11/2/06

58

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, SUE GERDES, a duly designated transcriber,

NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare

and certify under penalty of perjury that I have

transcribed tape(s) which total one in number and cover

a total of pages numbered 1 - 57, and which recording

was duly recorded at CALIFORNIA TRAINING FACILITY,

SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT

PAROLE CONSIDERATION HEARING of ELWIN LAY, CDC No. D-

71078, on NOVEMBER 2, 2006, and that the foregoing

pages constitute a true, complete, and accurate

transcription of the aforementioned tape(s) to the best

of my ability.

I hereby certify that I am a disinterested party

in the above-captioned matter and have no interest in

the outcome of the hearing.

Dated NOVEMBER 19, 2006 at Sacramento

County, California.


_____

Sue Gerdes, Transcriber
**Northern California Court Reporters**

57

1          **PRESIDING COMMISSIONER GARNER:**  Very good.

2     Thank you.  All right.  One thing we're going to

3     encourage you to do is there are a lot of mean, spirited

4     people that live here and they would love nothing more

5     to do than to engage you in some activity that might

6     jeopardize the date that we're proposing for you.  We

7     also know that you're starting on a trip right now and

8     that trip still has a couple other folks that are going

9     to have an opportunity to review it.  I'm hopeful we've

10    created a record that would stand the scrutiny of review

11    but until that process runs itself out, I encourage you

12    to kind of keep a low profile.  And I'll hope again,

13    that given the record -- it's your record, all we're

14    doing the report it.  It's what you've done, it's not

15    what we've done.  So with that I'm going to go ahead and

16    note that it is now 4:50 p.m. and that concludes this

17    hearing.

18                    **A D J O U R N M E N T**

19                        --oOo--

20

21

22

23    **PAROLE GRANTED**

24    **THIS DECISION WILL BE FINAL ON:**____**MAR - 2 2007**____

25    **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **ELWIN LAY  D-71078     DECISION PAGE 9     11/2/06**

## PROOF OF SERVICE BY MAIL
### BY PERSON IN STATE CUSTODY
(C.C.P. §§ 1013(A), 2015,5)

I, _____Elwin Lay II_____, declare:

I am over 18 years of age and I am party to this action.  I am a

resident of CORRECTIONAL TRAINING FACILITY prison, in the County

of Monterrey, State of California.  My prison address is:

     _Elwin Lay II_____, CDCR #:_D-70178_____
     CORRECTIONAL TRAINING FACILITY
     P.O. BOX 689, CELL #:_B-101L_____
     SOLEDAD, CA  93960-0689.

On _____6/7/07_____, I served the attached:

_____Petition for Writ of Habeas Corpus_____

_____

on the parties herein by placing true and correct copies

thereof, enclosed in a sealed envelope (verified by prison

staff), with postage thereon fully paid, in the United States

Mail in a deposit box so provided at the above-named institution

in which I am presently confined.  The envelope was addressed as

follows:    Jan Scully         Edmund G. Brown
            District Attorney    State Attorney General
            Sacramento County    P.O. Box 944255
            901 G Street #261A   Sacramento, CA  94244
            Sacramento, CA 95814

            Clerk of the Court
            Superior Court County of Sacramento
            Gordon D. Schaber Courthouse
            720 9th Street
            Sacramento, CA  95814-1398

I declare under penalty of perjury under the laws of the

State of California that the foregoing is true and correct.

Executed on __6/7/07_____.

                      *Elwin K. Lay II*

               _D-70178_____
               Declarant

# EXHIBIT "D"

# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SACRAMENTO

| | | | |
|---|---|---|---|
| DATE/TIME | : SEPTEMBER 20, 2007 | DEPT. NO | : 26 |
| JUDGE | : PETER MERING | CLERK | : J. LAYUGAN |
| REPORTER | : NONE | BAILIFF | : NONE |

IN RE THE PETITION OF ELWIN LAY,
      Petitioner

      Case No.: 07f06365

---

**Nature of Proceedings:**      **PETITION FOR WRIT OF HABEAS CORPUS - ORDER**

The petition for writ of habeas corpus has been filed and considered. It is DENIED.

Petitioner contends that his constitutional rights were violated when the governor overturned a decision by the Board of Parole Hearings (BPH) that he was suitable for parole.

A governor's decision granting or denying parole is subject to "limited" judicial review to determine "only whether the decision [was] supported by 'some evidence.'...[¶ S]uch review simply ensures that parole decisions are supported by a modicum of evidence and are not arbitrary and capricious." (*In re Rosenkrantz* (2002) 29 Cal. 4th 616, 625-626.)

The governor must consider the same factors as the parole hearing panel but does not have to give them the same weight. (*Id.* at p. 679.) "The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole. ...Although the parole authority is prohibited from adopting a blanket rule that automatically excludes parole for individuals who have been convicted of a particular type of offense, the authority properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant...." (*Id.* at p. 682.) The governor, however, must give "individualized consideration" to all relevant factors. (*Ibid.*)

"In some circumstances, a denial of parole based upon the nature of the offense alone might rise to the level of a due process violation--for example where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense. Denial of parole under these circumstances would be inconsistent with the statutory requirement that a parole date normally shall be set 'in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public. . . "Therefore, a life term offense or any other offenses underlying an indeterminate sentence

| | |
|---|---|
| BOOK | : 26 |
| PAGE | : |
| DATE | : SEPTEMBER 20, 2007 |
| CASE NO. | : 07F06365 |
| CASE TITLE | : IN RE: ELWIN LAY |

Superior Court of California, County of Sacramento


BY: J. LAYUGAN,
      **Deputy Clerk**

6365 habef

must be particularly egregious to justify the denial of a parole date." (*Id.* at p. 682-683.) The Governor may emphasize certain circumstances of an inmate's offense, as well as his post-offense conduct, that involve particularly egregious acts "beyond the minimum necessary" to sustain a conviction for second degree murder. (*Ibid.* at p. 682-683.)

Petitioner committed a murder for financial gain and did so by waiting until he got the signal to approach the victim. The governor cited these factors. While petitioner said he was angry at his second wife when the murder occurred, this anger does not translate into immediate provocation for murder of a third party who had no relationship to the marriage. The circumstances of the murder exceed the minimum elements, as cited in *Rosenkrantz*, and support the denial of parole.

Even if the court applied the approach to analysis that appears in In re *Lee* (2006) 143 Cal.App.4th 1400, in which it would compare this murder to other murders, the court would reach the same conclusion. The elements of financial gain, lack of provocation and lying in wait put this murder in a different category, even when compared with the murder in *Lee* and the cases cited therein. Admittedly, this murder occurred long ago and most other circumstances fail to show that petitioner is dangerous. A de novo review of the dangerousness question might lead to a conclusion that petitioner should be paroled. But that is not the proper standard for review. In the end, "heinous" murder remains a factor showing unsuitability, and this murder fits that definition. (See Title 15, Cal. Code Regs. § 2402(c).)

DATED:  9/20/09

**PETER MERING**
_____
PETER MERING, JUDGE RETIRED

BOOK          : 26
PAGE          :
DATE          : SEPTEMBER 20, 2007
CASE NO.      : 07F06365
CASE TITLE    : IN RE:  ELWIN LAY

**Superior Court of California, County of Sacramento**

BY:  J. LAYUGAN,
_____
        **Deputy Clerk**

**Page 2 of 2**

6365 habet

Case Number: 07f06. 5                                    Department: 26
Case Title:

## CERTIFICATE OF SERVICE BY MAILING
### (C.C.P. Sec. 1013a(4))

I, the Clerk of the Superior Court of California, County of Sacramento, certify that I am not a party to this cause, and on the date shown below I served the foregoing ORDER by depositing true copies thereof, enclosed in separate, sealed envelopes with the postage fully prepaid, in the United States Mail at Sacramento, California, each of which envelopes was addressed respectively to the persons and addresses shown below:

Elwin Lay II, D071078                Sacramento County Distsrict
Correctional Training Facility       Attorney's Office
P.O. Box 689, B-101L                 Writs of Habeas Unit
Soledad, CA  93960-0689              901 G Street
                                     Sacramento, CA  95814

I, the undersigned deputy clerk, declare under penalty of perjury that the foregoing is true and correct.

Dated: SEPTEMBER 20, 2007        Superior Court of California,
                                 County of Sacramento

                                 By: J. LAYUGAN,
                                     Deputy Clerk

LEGAL MAIL

ELWIN R. LATU, D-11010
CORRECTION TRAINING FACILITY
P.O. BOX 689, BW-101 L
SOLEDAD, CA. 93960-0689

CLERK OF THE UNITED STATES DISTRICT
FOR THE NORTHERN DISTRICT OF
450 GOLDEN GATE AVE.
P.O. BOX 36060
SAN FRANCISCO, CAL. 94102

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NO. DIST. OF CALIFORNIA

08 FEB 12 PH 1:02

RECEIVED